# Richmond.

## C. G. Blake Company, Inc., v. W. R. Smith and Son, Ltd.

### June 10, 1926.

1.  ATTACHMENT—*Motion to Quash as Ancilliary to the Hearing.*—A motion to quash the attachment is ancilliary to a hearing of the case on the merits and may be made before the return day of process. The statute (Code, 1919, section 6403) also provides that though the attachment be quashed, the case shall proceed upon the petition and be tried as upon a notice of motion for judgment if the principal defendant appears or is served with process.

2.  ATTACHMENTS—*Motion to Quash—Parties—Case at Bar.*—In the instant case, a proceeding by attachment, the court refused to sustain a motion made by the defendant to quash the attachment because the contract filed with the petition showed that in making the contract the plaintiff was acting as agent for three steamship companies noted at the bottom of the contract.

    *Held:* That there was nothing on the face of the contract to justify the court in quashing the attachment under section 6403 of the Code of 1919.

3.  AGENCY—*Contracts of Sale—Parties—Case at Bar.*—In the instant case plaintiff made a contract with defendant under which defendant was to furnish coal for a number of steamers. At the bottom of the contract the names of three steamship companies was placed. The exact interest of plaintiff or of the steamship companies in the steamers and business did not appear. The use of the word "buyers" as describing plaintiff indicated the intention so far as defendant was concerned to make the plaintiff individually liable in its own right as buyer. There was no suggestion in the terms of the contract that the plaintiff was acting otherwise than as the real contracting party.

    *Held:* That plaintiff was the proper party to sue for breach of contract. Even if it were shown that the plaintiff was, in making this contract, acting solely as agent under authority or directions of certain principals, there is no reason under the law of agency why the plaintiff could not have sued the defendant on this contract or the defendant have sued the plaintiff thereon.

4.  CONTRACTS—*Mutuality—What is Meant by Mutuality.*—It has been said

that a contract implies mutual obligations. If by mutuality of obligation is meant that there must be an undertaking on one side and a consideration on the other, the necessity for its existence cannot be questioned. But if mutuality of obligation means that a contract must be binding on both parties so that an action may be maintained by one against the other, the statement that mutuality of obligation is essential to every contract is too broad.

5. CONTRACTS—*Mutuality—What is Meant by Mutuality.*—Mutuality of contract as now commonly understood should properly be taken to be sufficiently complied with when there are promises on each side that something shall be done for the benefit of the other side, furnishing therefor considerations by each party, although they may relate to different terms of the contract and may be conditioned upon performance by the other party.

6. SALES—*Mutuality—Contracts for Bunkering—Case at Bar.*—In the instant case, the gist of the agreement between the parties was that the plaintiff agreed to take coal exclusively from the defendant at three mentioned ports and also agreed to pay various charges in connection with the coal; agreed to pay for it and specified the manner in which payment should be made; in consideration of this agreement the defendant agreed to supply the coal at a certain stated price.

   *Held:* That this agreement satisfied the requirement as to mutuality of consideration in a contract. The fact that defendant would not be required to furnish the coal until the steamers bunkered at one of the named ports did not destroy the mutuality of the contract.

7. SALES—*Construction—Verbal Prior Understanding cannot Vary a Written Contract—Case at Bar.*—In the instant case, an action by the buyer on a contract to furnish bunker coal, the lower court instructed the jury that prior verbal understandings could not vary a written contract.

   *Held:* That this instruction could do no harm to seller's contention that a term in the contract, regarding revision of prices upon the government abandoning control of the coal business, was to be construed in accordance with the interpretation put upon it by the seller.

8. SALES—*Contracts to Furnish Bunker Coal—Waiver by Buyer of Breach of Contract—Whether Waiver Applied to Future Deliveries—Case at Bar.*— In the instant case, an action by buyer on a contract to furnish bunker coal for a fixed period, the court instructed the jury that though they might believe that plaintiff waived a compliance with the terms of the contract during a part of the period covered by the contract, yet, it had a right thereafter to insist upon compliance in future with the terms of the contract, but it was for the jury to determine what the terms of the contract meant. During a period covered by the contract, the seller refused to furnish coal and the buyer

was forced to obtain it at higher price than the contract price, but afterwards insisted that the seller should supply coal at the contract price.

*Held:* That the instruction was proper.

9. Appeal and Error—*Law of the Case—Instructions not Objected to.*— Where an instruction is not objected to it becomes the law of the case.

10. Instructions—*Case Fairly Submitted to the Jury Although Instruction Subject to Criticism.*—Where the real issue between the parties is fairly submitted to the jury and the issue is clearly defined in the instructions and could not have been misunderstood by the jury, the plaintiff in error cannot be said to have suffered any damage by the instructions as given, whether or not the phraseology or exact correctness of any of the instructions as offered by the plaintiff or defendant might be subject to criticism.

11. Sales—*Construction of Contract—Contract to Furnish Bunker Coal— Prices Based upon Government Fixed Price and Subject to any Revision.*—The instant case was an action by a buyer on a contract to furnish bunker coal. The contract, after fixing prices to be paid for the coal, contained the following clause: "Price inserted is based upon the government fixed price, and subject to any revision." The coal business at the time was under the government control. Plaintiff asserted and introduced evidence to prove that by this provision concerning revision, the parties meant revision by the government of the fixed prices. Whereas defendant contended and introduced evidence to prove that by the provision the parties meant that upon the lifting of government control the prices should be governed by the market price.

*Held:* That this was clearly a question in which there was a conflict of evidence as to meanings of the terms used in the contract, and therefore the construction of the ambiguous language should be submitted to the jury.

12. Interpretation and Construction—*Written Instruments—Duty of Court and Jury.*—Where the language to be construed is unambiguous, its construction is a matter of law for the court; but where, considered along with other parts of the instrument, its meaning is uncertain, then the situation of the parties and the subject matter, and the construction placed upon it by the parties, especially the plaintiff, are matters of fact to be submitted to the jury with the writing under proper instructions.

13. Instructions—*Requested Instruction Based on a Partial View of the Evidence.*—Requested instructions based upon a partial statement of the evidence are properly refused.

14. Instructions—*Asking Court to Pass upon Construction of Contract which was Properly Submitted to the Jury.*—A requested instruction

asking the court to pass upon the question of the construction of a contract, which had been properly submitted to the jury, is properly refused.

15. APPEAL AND ERROR—*Conflicting Evidence—Verdict of Jury Conclusive.*—Where the verdict of a jury plainly determined upon the merits of the case that the position of the plaintiff was right, as to construction of an ambiguous clause in a contract, the conclusion of the jury upon the issue is final and the court did not err in overruling the motion of the defendant to set aside the verdict.

16. SALES—*Damages—Measure of Damages for Breach by Seller—Case at Bar.*—The instant case was an action by a buyer against the seller for breach of a contract to furnish bunker coal. The coal was not bought for resale.

    *Held:* That the measure of damages was the difference between the contract price and the market price of the coal at the time and place of the breach.

17. SALES—*Damages—Breach of Contract by Seller—Evidence.*—The instant case was an action for breach of contract to furnish bunker coal by the seller. Filed with the petition in the case was a statement showing the cost for bunkering each ship after the alleged breach and the amount claimed to have been lost on each ship. Bills for the coal purchased were also filed and a witness for plaintiff testified as to the correctness of the costs for bunkering the ships and the bills. Defendant offered no testimony at all in regard to this evidence showing the damages to the plaintiff.

    *Held:* That the jury were bound to be governed by this evidence as to damages if they found for the plaintiff, notwithstanding that the witness was an interested person.

18. EVIDENCE—*Uncontradicted Evidence—Whether Binding on Court and Jury.*—Uncontradicted evidence should ordinarily be taken as true, and cannot be wholly discredited or disregarded if not opposed to probabilities or arbitrarily rejected, even though the witnesses are parties or interested; and where the evidence tends to establish a fact which it is within the power and to the interest of the opposing party to disprove, if false, his failure to attempt to disprove it strengthens the probative force of the evidence tending to prove it. Uncontradicted evidence is not, however, necessarily binding on the court or jury, but may be disbelieved where it is contrary to natural or physical laws, opposed to common knowledge, inherently improbable, inconsistent with circumstances in evidence, or somewhat contradictory in itself, especially where the witness is a party or interested, or where in the very nature of things it is impossible to secure opposing testimony.

19. SALES—*New Trials—Damages—Jury Disregarding the Evidence—Case at Bar.*—In the instant case, an action for damages by a buyer against the seller for breach of a contract to furnish bunker coal, the jury

found a verdict for the plaintiff but fixed his damages at a lower sum than that claimed by him. Plaintiff's evidence as to the amount of damages was uncontradicted and from this evidence the assessment of damages was a mere calculation.

*Held:* That the jury having found for the plaintiff should have awarded the amount of damages necessarily following such finding, and that the trial court did not err in setting aside the verdict and entering judgment for the larger amount.

Error to a judgment of the Circuit Court of the city of Norfolk, in a proceeding by attachment. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Wilcox, Cooke &amp; Wilcox* and *Hughes, Little &amp; Seawell* and *Murray Seasongood,* for the plaintiff in error.

*Baird, White &amp; Lanning* and *Charles R. Hickox,* for the defendant in errorr

CRUMP, P., delivered the opinion of the court.

This is a writ of error from a judgment against the defendant in a proceeding instituted in the circuit court by a petition in foreign attachment in which the principal defendant appeared and a trial was had before a jury. There was a verdict for $28,000.00, which, on motion of the plaintiff, was set aside as inadequate, and the court being of opinion that the evidence plainly showed that the plaintiff would be entitled to at least $98,345.00, rendered judgment for that amount. The plaintiff in error here, C. G. Blake Company, Inc., was the defendant on the trial and W. R. Smith &amp; Son, Ltd., was the plaintiff on the trial. The parties in this opinion will be referred to in the positions they occupied on the trial, and therefore W. R. Smith &amp;

Son will be referred to as plaintiff. The petition set out that the defendant had agreed to furnish bunker coal for steamers managed and controlled by the plaintiff, and which should be bunkered at Newport News, Sewall's Point or Lambert's Point in Virginia. A copy of the contract is filed with the petition and in order for a clear understanding of the case it is now transcribed and is as follows:

"NEW YORK, N. Y., February 24, 1920.

"Memorandum of Agreement between W. R. Smith & Sons, Ltd., of Cardiff, Wales, hereinafter called the buyers, of the one part, and the C. G. Blake Company, Inc., of the other part.

"The C. G. Blake Company, Inc., agrees to supply the coal required at the undermentioned ports for customary replenishment of bunkers of steamers of which buyers are registered managing owners, the coal not being for account or use of time-charters of buyer's steamers, and the buyers agree to take coal exclusively from the suppliers at such ports.

"Steamers to lie at customary anchorages, provide a free side and give free use of winches, tackle and winchmen, and to load in the customary turn and manner in accordance with the practice of each respective port, subject to weather conditions. Coaling to be done during customary hours. Extra expenses, if any, incurred for Sundays, holidays, night work and for coaling in quarantine shall be for steamer's account.

"Prices to be as stated herein.

"Newport News, Va. Blake New River Coal...................... $6.20 per ton of 2240 lbs. delivered at chutes.
"Sewall's Point, Norfolk, Va. Blake New River Coal..................
"Lambert's Point. Pocahontas Coal.

"The dumping and trimming charge as assessed by railroad company per ton of 2240 lbs. will be made upon total quantity taken.

"Terminal or port charges, docking, undocking, running of lines, agency, stevedoring, war tax, etc., to be paid by buyer, price inserted is based upon government fixed price and subject to any revision. Any extra duties, taxes, change in railway rates, port charges and other charges, either at the country of origin or of supply levied on coal after signing this contract shall be for buyers account.

"Payment for coal supplies and disbursements is to be made as follows: In cash, at port of shipment or at suppliers' option by honor of captain's draft in sterling, at current rate of exchange on managing owners, at 30 days sight, payable in London, without right of set-off or counter-claim. In the event of failure to honor any draft for coal or other necessaries, this and any similar contracts in force with the C. G. Blake Company, Inc., shall be subject to cancellation by the C. G. Blake Company, Inc., without notice.

"The suppliers shall not come under any liability for complete or partial nondelivery or delay in delivery of coal resulting from inability to supply arising from the act of God, perils of the seas, ice, war, hostilities, riot, arrest and restraint of princes, rulers and peoples, political disturbances, or impediments, epidemics, quarantine, fire, pestilence, accidents in mines from which coals contracted for are intended to be drawn, or in docks, obstructions on railways, shortage of trucks, strikes, lock-outs, whether general or partial, stoppage of pit-men, trimmers or other labor difficulties at home or abroad, or from circumstances, hindrances or accidents of any kind whatsoever beyond suppliers control, whereby the working of the business is affected.

"This agreement comes into force February 24, 1920, and is binding until January 1, 1921, only upon the suppliers when accepted by them and covers steamships listed on back hereof.

"*Buyers,*  W. R. SMITH & SONS, LTD.
"BY W. G. LILEY
"ST. JUST STEAMSHIP CO., LTD.
"LEEDS SHIPPING CO., LTD.
"CORNBOROUGH SHIPPING CO.,
LTD.

"Accepted:
"THE C. G. BLAKE, COMPANY, INC.
"By F. S. WALDEN, eastern manager.
"If service not satisfactory, owners at any time to be at liberty to cancel this contract."

It was alleged in the petition that up to about July 14, 1920, the defendant supplied bunker coal for steamers that were bunkered at the three several ports mentioned, but that on that date the defendant notified the petitioner that it would not supply any more bunkers for the petitioner's steamers at the said three ports, and in consequence of the defendant's refusal to comply with the undertaking, the petitioner was obliged to purchase and did purchase from others coal for the customary replenishment of the bunkers of its steamers. The plaintiff claimed that by reason of breach of contract so stated, it was entitled to recover the difference between the contract price of $6.20 per ton and the price which the plaintiff paid for the coal bought for the necessary bunkers of its steamers at the said ports after July 14, 1920, up to the termination of the agreement between the parties, January 1, 1921, the agreement having gone into effect on February 24,

1920. The defendant appeared and answered the petition, denying the allegations therein contained. When the jury brought in their verdict for $28,000.00, two motions were made; the defendant moving to set the verdict aside as contrary to the law and the evidence, and the plaintiff moving to set aside the verdict on the ground that the jury had found for the plaintiff upon the merits and that undisputed evidence necessitated a recovery for the larger amount above mentioned, whereupon the court overruled the motion of the defendant, allowed the motion of the plaintiff, and entered a judgment for $98,345.75. The plaintiff petitioner was a corporation organized under the laws of Great Britain and the defendant corporation was organized under the laws of the State of Ohio, both concerns having offices and agents in New York and Norfolk. Several parties were made co-defendants to the petition and they appeared and filed answers as to their indebtedness to the principal defendant.

[1, 2] The first error assigned is to the ruling of the court refusing to sustain a motion made by the defendant to quash the attachment. It is argued in support of the motion that the contract filed with the petition showed that in making the contract the plaintiff was acting as agent for the three companies noted at the bottom of the contract, to-wit: St. Just Steamship Co,., Ltd., Leeds Shipping Co., Ltd., and Cornborough Shipping Co., Ltd. This motion was made independently of and about a month before the trial. It would rather appear that the ground upon which the motion was based does not come within the purview of the statute which allows such a motion to be made, and the attachment to be quashed if the court is of opinion that the attachment is invalid on its face or was issued on false suggestion or without sufficient cause. Code

of Virginia, section 6403. A motion to quash the attachment is ancillary to a hearing of the case on the merits and may be made before the return day of process. The statute also provides that though the attachment be quashed, the case shall proceed upon the petition and be tried as upon a notice of motion for judgment if the principal defendant appears or is served with process. It is not shown whether or not the court heard evidence on the motion to quash and, in any event, we are of opinion that there is nothing on the face of the contract to justify the court in quashing the attachment and therefore this assignment of error is without merit.

The second assignment of error is to the ruling of the court admitting evidence claimed to have been inadmissible. In the course of the evidence offered by the plaintiff, the contract filed with the petition and above transcribed was offered as evidence, the objection of the defendant overruled and the defendant excepted. The argument is made that this contract was inadmissible for two reasons: (a) Upon the ground that the plaintiff made the contract as agent for three principals who were interested in the recovery of the damages claimed and that no one of the three had the right to recover for or be interested in any recovery for damages sustained by the other, and while the agent might sue in his name for one of them he could not sue for all in one action; (b) upon the ground that the contract was invalid for lack of mutuality between the parties.

[3] Upon the face of the contract and in the evidence it is shown that the plaintiff company was engaged in buying bunker coal for a number of steamers of which it was the managing and registered owner. The exact interest in the steamers themselves and the business done by the steamers and the profits made in

the carriage by them of cargoes does not appear. No doubt the placing of the names of the three steamship companies above mentioned at the bottom of the contract indicated that those three companies had an interest in the business done by the steamers. The contract and the evidence show that the plaintiffs were called "buyers" in the contract, which so far as the defendants were concerned under the contract, indicated an intention to make the other party individually liable in its own right as buyer. There is no suggestion, according to the terms of the contract, that the plaintiff was acting otherwise than as the real contracting party. Whatever arrangement may have existed with reference to the personal undertaking of the plaintiff in connection with other parties who might be interested, and whatever might have been the interest of the plaintiff in the steamers or in the business done by them, we think it clear that the plaintiff was the proper party to sue upon the contract which it had made in its own name. It is a common thing in business of this character for large foreign corporations to undertake to contract in their own name in matters of this sort relative to world shipping. Even if it were shown that the plaintiff was, in making this contract, acting solely as agent under authority or directions of certain principals, there is no reason under the law of agency why the plaintiff could not have sued the defendant on this contract or the defendant have sued the plaintiff thereon. We deem it unnecessary to refer to familar principles of law of principal and agent to justify this statement. We do not think the argument in this respect can be sustained.

[4] The other ground upon which it is contended that the contract is inadmissible raises a question of

considerable interest.    Mr. Williston and other writers upon the philosophic side of the law of contracts demonstrate, if anything, that it is almost impossible to state a clear cut predicate upon which a discussion of mutuality necessary to the validity of contracts may be based.    Perhaps the statement of the modern law in this respect, found in 6 R. C. L. 686, is as correct a statement of the prevailing law in this country as can be cited:

"In many judicial decisions there may be found language to the effect that in order that a contract may be enforceable there must be mutuality.    It has been said that a contract implies mutual obligations. If by mutuality of obligation is meant, as some courts have suggested, that there must be an undertaking on one side and a consideration on the other, the necessity for its existence cannot be questioned.    But if, as other courts have said, mutuality of obligation means that a contract must be binding on both parties so that an action may be maintained by one against the other, the statement that mutuality of obligation is essential to every contract is too broad.    The older decisions dealing with the specific enforcement of contracts, it is true, seemed to require that the contract shall be binding on both parties.    The doctrine has, however, been modified by modern decisions."

[5, 6] The case of *Texas Company* v. *Pensacola Maritime Corporation* (C. C. A.), 279 Fed. 19, reported in 24 A. L. R. 1336, with another case immediately following it and annotated (*Oscar Schlegel Mfg. Co.* v. *Peter Cooper's Glue Factory*, 231 N. Y. 459, 132 N. E. 148), discusses at some length the question of mutuality in a contract of the character here involved, and is authority for the holding that in this class of contracts sufficient mutuality exists.    Mutuality of

contract as now commonly understood should properly
be taken to be sufficiently complied with when there
are promises on each side that something shall be done
for the benefit of the other side furnishing therefor
considerations by each party, although they may
relate to different terms of the contract and may be
conditioned upon performance by the other party.
In the instant case, the plaintiff is described as buyer
in the contract and did agree to buy exclusively from
the defendant coal for such steamers as might bunker
at the three ports mentioned. The buyer also agreed
to pay certain port charges, stevedoring expenses and
other matters. The contract provided for the method
of payment, etc. The gist of the agreement between
the parties was that the plaintiff agreed to take the
coal exclusively from the sellers at the three mentioned
ports and also agreed to pay various charges in con-
nection with the coal; agreed to pay for it and specified
the manner in which payment should be made; in
consideration of this agreement the defendant agreed
to supply the coal at a certain stated price. In our
opinion there was sufficient consideration rendered by
each of the parties to satisfy any requirements of the
law that there must be mutuality of consideration in a
contract. The plaintiff was engaged in arranging for
the coaling of the steamers on their various voyages
to and from American ports. The three ports men-
tioned were known to be the coaling places for shipping
in Virginia. The fact that the contract was conditional
to the extent that the defendant would not be required
to furnish the coal unless and until the steamers
bunkered at one of the named ports, does not destroy
the mutuality of the contract nor interfere with the
binding force of the defendant's promise to coal ships
when called upon to do so in accordance with the con-

tract.    Williston on Contracts, section 140; *Wessel, Duval & Co.* v. *Crozet Cooperage Co.*, 143 Va. 469, 130 S. E. 393; *Bridges* v. *Home Guano Co.*, 33 Ga. App. 305, 125 S. E. 872; *Blenner* v. *Vim Motor Co.*, 136 Va. 189, 117 S. E. 834.    The agreement concludes as follows:

"This agreement comes into force February 24, 1920, and is binding until January 1, 1921, only upon the suppliers when accepted by them and covers steamers listed on back hereof."

The agreement was accepted by the defendant, designated in the contract as suppliers, and a list of the steamships covered was furnished to them as the evidence shows.    In our opinion, there was a valid contract entered into between the parties, covering the period mentioned, which was binding upon the defendant to furnish bunker coal in accordance with the terms of the contract whenever required to do so for the steamers mentioned.

The next two assignments of error relate to certain instructions given at the instance of the plaintiff and to certain others asked for by the defendant and refused. In order to understand the relevancy and propriety of these instructions, it is necessary to state briefly the character of the issue or issues arising for decision by the jury upon the evidence.

The contract provides for delivery by the plaintiff at the several ports of bunker coal at $6.20 per ton for the period covered by the contract.    The original contract is upon a blank form with the various blank spaces filled in by typewriting, with stipulations appearing on the face of the contract.    Among the matters typewritten in the contract is the following:

"Price inserted is based upon the government fixed price and subject to any revision."

It appears that at the time the contract was made,

he business of marketing coal in this country was under government control and coal supplied for bunkering steamers was furnished at a price regulated and fixed by the government, which could not be varied by agreement of the parties. The price of such coal at the time of the contract was $6.20; and therefore that price appears on the face of the contract. The negotiations for the making of the contract took place in effect exclusively between one Liley, agent for the plaintiff company, and one Walden, eastern manager and agent for the defendant company. Both of these agents testified at some length and their testimony constitutes the bulk of the evidence. There is conflict between them as to what was said and done concerning the price to be put in the contract; and as to the reason for the insertion of the language just transcribed. For the plaintiff it was insisted that, as the parties knew that the fixed price at the time was $6.20 and it might be revised at any time by the government, since the government was supposed to keep an eye on the coal market and raised or lowered the price according to the condition of the market and good judgment as to what should be the price; therefore, the contract meant that the price should remain until January, 1921, at $6.20 per ton, subject only to revision by any change that might be made by the government, but not otherwise. It was insisted on the part of the defendant that both parties knew that the government control might be released at any time and the stipulation, therefore, that the price was subject to revision was intended to leave the parties, in the event government control ceased, to deal upon the prevailing market price at the time coal was furnished. Both of the agents mentioned testified at considerable length, detailing all prior negotiations, including the

circumstances surrounding the parties and connected with furnishing coal generally, and going into all of the dealings under the contract up to the time in July when, as the plaintiff claimed, the defendant refused to comply any longer with the contract. It is apparent from all the evidence that the right of recovery on the part of the plaintiffs depended upon the construction which might be placed upon the contractual provision as to revision of price. It appears in the evidence that on the 19th of March, 1920, the government gave notice that on and after April 1st, next, the government would release its control over the coal market and, therefore, its regulation of price would no longer be in existence. This, of course, came to the knowledge of both Mr. Liley and Mr. Walden. It is shown that before the 1st of April one steamer came to Hampton Roads and the defendant supplied the coal for the replenishment of the bunkers at the contract price of $6.20. It then appears that from April 30th to July 6th seven steamers included in the plaintiff's list were bunkered at one of the Hampton Roads ports at prices prevailing from $7.56, which was paid for the ship bunkered on April 30th, to $15.06 for the steamer bunkered on July 6th, the evidence showing that the market price for coal was rising during that period. Mr. Liley testified that he yielded to the requirement of the defendant during that period that he should pay a greater sum for the coal than $6.20 per ton, because of his desire to have the business in any event carried on, and that he had at various times protested that he regarded the contract as in force and that he was entitled to the contract price; that the defendant did not insist upon the full market price, and yielded to his insistence to the extent of furnishing the coal at figures below market prices.

He insisted that he had at no time waived any of the terms of the contract between the parties, but insisted at all times it was in force.    Mr. Liley stated that he "appreciated the difficulty the coal people were in, but I tried to run things as amicably as I could to avoid friction."    He also testified that there was some dispute as to what should be paid for coal furnished to the ·ship bunkered ·on July 6th.    Touching the alleged breach of the contract, Liley testified that the defendant, upon this matter being taken up in New York with Mr. Walden, wrote him that unless the price charged for the coal for this last steamer was paid, the defendant would be compelled to decline to bunker the other steamers in Hampton Roads; that he regarded it was a threat to attach the ship, and that in order to avoid delay he paid the price required; that there was a considerable jump in the price charged for this steamer and he protested to Mr. Walden concerning it, but in the meantime he received instructions to insist that Blake & Son carry out the terms of the contract; that the European owners cabled him very strongly about that matter so he tendered the defendant a check for the contract amount.    He then testified as follows:

"Q. Did you have an interview with them on the 14th of July?

"A. Yes, sir.

"Q. Was this situation discussed?

"A. It was.

"Q. Did you make any inquiry of Walden as to whether or not he would continue to furnish bunkers?

"A. At the contract price.

"Q. Did you make such inquiry?

"A. Yes.

"Q. What did he say?

"A. He said no that he would not at $6.20.

"Q. Did he make any statement about what he was prepared to do?

"A. He was prepared to supply us with bunkers at the prevailing price, whatever that might be, when the ship arrived.

"Q. Did you write any agreement with him about anything at that interview?

"A. No; I don't remember.

"Q. After you left him, did you write him a letter?

"A. I did.

"Q. Is this the letter?

"A. That is the letter."

For the defendant, Mr. Walden testified at considerable length as to all the interviews between the parties, and his testimony tends on his side strongly to show that by the use of the words in the contract concerning the revision in price, the parties meant that upon the lifting of government control the prices should be governed by the market prices. He contradicted the testimony given by Mr. Liley as to various details mentioned in his evidence.

Upon all the evidence before the jury, the right of recovery manifestly turned upon the proper construction, and application to the case, to be given the language providing for the revision in price. The record shows that this situation was in fact understood by the parties as the real question of fact to be determined by the jury.

The instructions given by the court are eight in number, four of which were given at the instance of the plaintiff, three at the instance of the defendant, and one given by the court, evidently in lieu of other instructions offered. In order that the assignment of error based upon the granting and refusing of instruc-

tions may be intelligently determined, it is essential that the instructions given by the court should be considered in their entirety, and they are as follows:

I. "The court instructs the jury that the contract being in writing the jury cannot consider evidence of any prior or contemporaneous verbal understanding inconsistent therewith.

II. "The court instructs the jury that even though they may believe from the evidence the plaintiff waived a compliance with the terms of the contract prior to July, 1920, it had a right thereafter to insist upon a compliance with said terms, but it is for the jury to determine what the terms of the contract mean.

III. "The law attaches great importance to the recognition and enforcement of the provisions of written agreements, and the jury should not find that there was any understanding that the terms of the written contract sued upon were waived or changed unless they are satisfied by a preponderance of the evidence of the existence of such an intention. *Standard Ice Co. v. Lynchburg Ice Co.*, 129 Va. 531, 105 S. E. 563.

IV. "If the jury find for the plaintiff, the measure of its damages is the difference between the contract and market prices of the coal to be furnished under the terms of the contract at the times and places when and at which it should have been furnished.

V. "The court instructs the jury that in determining what was the real contract between the parties in this case they shall consider not only the writing offered in evidence as the contract, but all the evidence which has been offered by either party not inconsistent with its terms. They may also consider the situation of the parties with reference to each other, and to the subject matter, and may also consider the construc-

tion they placed upon the contract in their subsequent dealings with each other. *M. C. Corkle & Sons* v. *Kincaid*, 121 Va. 546-550, 93 S. E. 642; *Albert* v. *Tidewater, etc.*, 107 Va. 256-260, 58 S. E. 575.

VI. "The court instructs the jury that if they believe from the evidence when the parties inserted in the contract the words: 'Price inserted is based upon government fixed price and subject to any revision,' they agreed as to their meaning. Then in any future construction of the contract the parties are bound by the meaning of such words as agreed upon at the time they were inserted, unless the meaning was subsequently modified expressly or impliedly by the parties.

VII. "The court instructs the jury that it is for you to decide under all of the evidence whether the word 'revision' as used in this contract, and the whole clause relating to price, namely: 'Price inserted is based upon government fixed price and subject to any revision,' means that if the government should cease to regulate the price of coal, the price of $6.20 a ton should no longer continue.

"In determining what the contract was you are to try to carry out the intention of the parties and may consider the negotiations leading up to the making of the contract, and any construction the parties placed on the contract during the period of performance.

VIII. "The court instructs the jury that the only question in dispute for them to decide is what the parties to the contract dated February 24, 1920, and introduced in evidence, intended by the words 'price inserted is based on government fixed price and subject to any revision;' and in deciding that question they should consider the entire contract itself, the

business in which the parties were engaged, the subject matter of the contract they were making, the previous dealings of these parties with reference to this same general subject matter, the market conditions existing at the time they made the contract, and all the facts and circumstances offered in evidence surrounding the parties at that time; and they may also consider the manner in which the parties acted in carrying the contract into effect as tending to show the interpretation put by the parties themselves upon this language."

[7, 8] Taking up first the four instructions granted upon the request of the plaintiff, we see no objection to the first instruction given, which merely states the general principle of law that prior or verbal understandings cannot vary a written contract. This could do no harm to the defendant's contention that the revision term of the contract was to be construed in accordance with their interpretation. The second instruction embodies the settled principle of law that though the plaintiff could not complain of any breach of the contract as to the period during which he paid a greater price than he thought he could be compelled to pay, yet he had a right to insist thereafter upon the compliance with the contract, and it was for the jury to determine what the contract meant and whether that insistence was proper. A consideration of all the testimony in the case demonstrates very clearly that the jury necessarily perceived that the real issue of fact between the parties was whether the language, "price inserted is based upon government fixed and subject to any revision," meant revision only by the government or whether it meant, within the intention of the parties, revision by market changes in the event government control ceased during the contract period.

[9, 10] The last instruction above transcribed, that

drawn by the court, was not objected to by the plaintiff in error and, therefore, became the law of the case. The issue there so clearly defined could not have been misunderstood by the jury, nor could they have misjudged the way in which they should view the evidence, in the light of the three instructions just preceding this last instruction.    The real issue between the parties was fairly submitted to the jury, and the plaintiff in error could not have suffered any damage by the instructions as given, whether or not the phraseology or exact correctness of any of the instructions as offered by the plaintiff or defendant might be subject to criticism.

[11] This was very clearly a case in which there was a conflict of evidence as to the meaning of the terms used in a contract, and, therefore, the construction of the ambiguous language should be submitted to the jury.

[12] In *Devany* v. *City of South Norfolk,* 143 Va. 768, 129 S. E. 672, the court says:

"It is true that where the language to be construed is unambiguous, its construction is a matter of law for the court; but where considered along with other parts of the instrument, its meaning is uncertain, then the situation of the parties and the subject matter, and the construction placed upon it by the parties, especially the plaintiff, are matters of fact to be submitted to the jury with the writing, under proper instructions."

In *Rickard* v. *Rickard,* 134 Va. 485, on page 494, 115 S. E. 369, 372, the court holds (on page 494):

"As a general rule it is the duty of the court and not of the jury to construe written instruments. *Burke* v. *Lee,* 76 Va. 386, 388.    Where, however, the true meaning of the terms of the instrument depends upon

parol testimony as to the effect, of which there may be a difference of opinion, the question is one for the jury, upon proper instructions, to decide."

"This language was quoted with approval in *Geoghegan* v. *Arbuckle Bros.*, 139 Va. 92 (on page 101), 123 S. E. 387, 389, 36 A. L. R. 399; and see *Turner* v. *Hall*, 128 Va. 247, 104 S. E. 861; *American Ins. Co.* v. *Damascus, etc., Co.*, 139 Va. 38, 124 S. E. 269. We find nothing in the instructions prejudicial to the plaintiff in error.

[13, 14] Three instructions asked for by the defendant were refused. These instructions were either based upon a partial statement of the evidence, or they requested the court to pass upon the question of construction which, as is shown, was properly submitted to the jury. We are of opinion, therefore, that these additional instructions of the defendant were properly refused.

[15] The verdict of the jury plainly determined, upon the merits of the case, that the position of the plaintiff was right, and the defendant was not justified in its contention that after bunkering of the steamer on July 6th, it would not furnish the bunkering coal any further under the contract at the contract price. The conclusion of the jury upon this issue was final, and the court was not in error in overruling the motion of the defendant to set aside the verdict.

After the verdict of the jury in favor of the plaintiff for $28,000.00 had been returned, the court, on motion of the plaintiff, set aside the verdict of the jury "so far as necessary" and gave judgment in favor of the plaintiff for $98,345.75, with interest. This ruling and judgment of the court is the subject of the last assignment of error.

[16] The trial court was of opinion that upon the

evidence in the case there was no occasion for dispute as to the difference between the contract price and the market price of the coal; that the plaintiff had shown, as to each ship bunkered after the controversy arose in July, the exact amount of coal required and bunkered; that this coal had been purchased in the market after reasonable diligence at the best obtainable prices; that the defendant not having sought to contradict this evidence, the assessment of the damages was a mere calculation, and the jury having found for the plaintiff could not do otherwise than award the amount of damages necessarily following the finding for the plaintiff.

After a careful review of the evidence, we are constrained to agree with the views of the court in this respect. In the instant case the coal was not bought for resale. Both parties knew that this was an ordinary case of a sale by dealers to consumers, and for delivery to consumers at times when in case of nondelivery their necessities would require them to buy elsewhere.

The instruction given by the court states succinctly the measure of damages applicable in such a case. As said in 2 Williston on Sales (2nd ed.), section 599:

"The general principle already stated that the measure of damages for breach of an obligation is the sum which will put the plaintiff in as good a position as he would have been *in if the obligation had been fulfilled applies here also.* And the application of the doctrine can be summed up by the same formula where the buyer is the plaintiff as in the case where the seller is the plaintiff. The proper measure of damages in general is the difference between the contract price and the market price of such goods at the time when (and place where) the contract is broken, because the purchaser having the money in his hands

may go into the market and buy, and it may be added that if the buyer pays more than the market price, it is not the seller's wrong, but his own error of judgment which was the cause of excessive payment." *Hopkins* v. *LeCato*, 142 Va. 769, 128 S. E. 55.

Filed with the petition in the case was a statement showing the cost for bunkering each ship after the alleged breach in July, and the amount claimed to have been lost on each ship, as follows:

"Statement showing bunker coals purchased at Hampton Roads, July-December, 1920, in accordance with letter dated 14th July, 1920, from W. G. Liley to Messrs. C. G. Blake & Co., Inc., and comparing cost at prices paid with cost at price according to contract with C. G. Blake & Co., Inc.:

Opinion.

| STEAMER | DATE | | PLACE | Quantity tons | Price per ton | | Total Cost | | Cost at Contract Price | | Difference above Contract Price | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| King City | July | 21 | Newport News | 669 | $16 | 50 | $11,038 | 50 | $ 4,147 | 00 | $ 6,890 | 70 |
| Brookvale | " | 23 | " | 748 | 16 | 50 | 12,342 | 50 | 4,637 | 60 | 7,704 | 40 |
| Hurliness | " | 26 | " | 494 | 20 | 00 | 9,880 | 00 | 3,062 | 80 | 6,817 | 20 |
| Great City | Aug. | 4 | " | 1243 | 16 | 50 | 20,509 | 50 | 7,706 | 60 | 12,802 | 90 |
| Bradburn | " | 6 | " | 447 | 16 | 50 | 7,375 | 50 | 2,771 | 40 | 4,604 | 10 |
| Skegness | " | 23 | " | 594 | 14 | 50 | 8,613 | 00 | 3,682 | 80 | 4,930 | 20 |
| Watsness | " | 23 | " | 561 | 14 | 50 | 8,134 | 50 | 3,478 | 20 | 4,656 | 30 |
| Bradford City | Sept. | 15 | " | 347 | 13 | 00 | 4,511 | 00 | 2,151 | 40 | 2,359 | 60 |
| Madras City | " | 22 | " | 1048 | 13 | 00 | 13,624 | 00 | 6,497 | 60 | 7,126 | 40 |
| Brookvale | " | 25 | " | 341 | 13 | 00 | 4,433 | 00 | 2,114 | 20 | 2,318 | 80 |
| Hurliness | " | 29 | " | 47 | 13 | 00 | 611 | 00 | 291 | 40 | 319 | 60 |
| Great City | Oct. | 5 | " | 1352 | 13 | 00 | 17,576 | 00 | 8,382 | 40 | 9,193 | 60 |
| Dungeness | " | 11 | " | 729 | 13 | 00 | 9,477 | 00 | 4,519 | 80 | 4,957 | 20 |
| Yarborough | " | 12 | " | 605 | 13 | 00 | 7,865 | 00 | 3,751 | 00 | 4,114 | 00 |
| Watsness | " | 14 | " | 743 | 13 | 00 | 9,659 | 00 | 4,606 | 00 | 5,052 | 40 |
| King City | " | 25 | " | 491 | 13 | 00 | 6,383 | 00 | 3,044 | 20 | 3,388 | 80 |
| Leeds City | " | 25 | " | 426 | 13 | 00 | 5,538 | 00 | 2,641 | 20 | 2,896 | 80 |
| Jersey City | Nov. | 3 | " | 1292 | 13 | 00 | 16,796 | 00 | 8,010 | 40 | 8,785 | 00 |
| Bradford City | " | 4 | " | 161 | 13 | 00 | 2,093 | 00 | 998 | 20 | 1,094 | 80 |
| Bradburn | " | 11 | " | 671 | 13 | 00 | 8,723 | 00 | 4,160 | 20 | 4,562 | 80 |
| Skegness | " | 15 | Sewall's Point | 700 | 13 | 00 | 9,100 | 00 | 4,340 | 20 | 4,760 | 80 |
| Bradavon | " | 20 | " | 1145 | 12 | 50 | 14,317 | 50 | 7,099 | 00 | 7,218 | 50 |
| Madras City | " | 30 | Lambert's Point | 1171 | 11 | 75 | 13,759 | 25 | 7,260 | 20 | 6,499 | 05 |
| Brookvale | Dec. | 9 | Newport News | 335 | 11 | 00 | 3,685 | 00 | 2,077 | 00 | 1,608 | 00 |
| Great City | " | 14 | Lambert's Point | 1474 | 9 | 00 | 13,266 | 00 | 9,138 | 80 | 4,127 | 20 |
| Devon City | " | 28 | Newport News | 1059 | 9 | 00 | 9,531 | 00 | 6,565 | 80 | 2,965 | 20 |
| | | | | | | | $248,840 | 75 | | | $131,704 | 15" |

The witness, Liley, for the plaintiff testified as to each one of these bunkerings except as to the sailings which took place on July 23rd and 26th, August 4th, September 25th, November 3rd and December 9th. His testimony was of the following character, he being questioned as to each bunkering, with a receipted bill in his hand showing payment to the parties from whom the coal was purchased at a Hampton Roads port:

"Q. Who supplied the bunkers for the King City on her sailing on July 21, 1920?

"A. The White Oak Company.

"Q. What quantity did they supply?

"A. I couldn't tell without refreshing my memory.

"Q. Did you pay for the coal yourself?

"A. Yes, sir.

"Q. And did you get a receipted bill from the White Oak Coal Company?

"A. Yes, sir.

"Q. Is that the receipted bill?

"A. That is the receipted bill.

"Q. Are you able, by refreshing your recollection from that bill, to state what the quantity of coal was that was supplied and what the price was that you paid?

"Judge Willcox: I object to that. We are getting down to the question of proving damages. They are seeking to hold us· to a quantity of coal put on the ship. The mere fact Mr. Liley paid for it does not prove that that amount of coal went on the ship. It does not prove that that was the market price for the coal at that time. It seems to me the proper proof would be to prove by the White Oak Coal Company that they delivered that much coal to the ship and the price, and prove any way that they can that is the

market price. The fact that it is on the bill does not prove it.

"The court: It is some evidence of it. There is no question about the fact that it was their ship and the bill was furnished him for the coal that went on it. There is some evidence as to the amount and some evidence as to the price.

"Judge Willcox: That could not hold us for anything except the market price.

"The court: Of course not; but it is some evidence of it. I overrule the objection.

"Judge Willcox: We take an exception.

"Q. Will you answer the question?

"A. A little over six hundred tons—669 tons.

"Q. What was the price?

"A. $16.50.

"Q. I asked you previously in general terms whether you ascertained the quantity of coal necessary for the customary replenishment of the steamer's bunkers?

"A. Yes, sir.

"Q. Did you ascertain what the customary replenishment of the King City bunkers would be?

"A. Yes, sir.

"Q. What was the amount?

"A. Dependent on what she had on arriving.

"Q. What was it on this occasion?

"A. 669 tons.

"Q. Did you make inquiries in the coal market as to the price of coal?

"A. I did.

"Q. Did you communicate with numerous dealers?

"A. I did.

"Q. Did you get suggestions from them about what their price was?

"A. I did.

"Q. And what was the best price offered to you by any coal dealer?

"A. $19.50, and very hard to get at that, and they would not promise it would be there when it was to be put on.

"Q. Did you inquire both in New York and Norfolk?

"A. Both at New York, Norfolk and Newport News.

"By the court:

"Q. When was that?

"A. In July.   She was here near a month.

"By Mr. Hickox:

"Q. When did the Hurliness arrive at Hampton Roads?

"A. I couldn't tell you the exact date of her arrival.

"Q. When did she get bunkers, if she got it at all?

"A. It was after the date of our trouble.

"Q. Have you anything to indicate what the date was?

"A. I have some more papers over there.   May I have that list?

"Q. Oh, yes; get your papers, whatever you may need.

"A. (Witness leaves the stand and returned with papers.)   Referring to my record, somewhere around the 26th July.

"Q. From whom did you purchase bunkers for that vessel?

"A. I think, if I remember rightly, it was purchased from Maryland Coal Company.

"Q. I show you that document, and ask you what that is?

"A. It is a receipted bill, it is a bill, rather.

"Q. Did you ascertain what the necessary requirement was for the replacement of the bunkers of the Hurliness?

"A. Yes.

"Q. What was the amount?

"A. The amount necessary on the Hurliness was 960.

"Q. What amount did you buy?

"A. That I don't remember.    The amount was 960. Whatever the surplus was was made up.

"Q. Will you refresh your memory by this document and tell me what you bought?

"A. 494 gross tons.

"Q. Did she require that additional quantity for the replenishment of bunkers?

"A. Yes, sir.

"Q. What was the price you paid?

"A. $20.00.

"Q. What efforts did you make to secure coal at that time?

"A. From other people.    It was very, very difficult to get coal at any price.

"Q. Did you inquire of dealers in New York, Norfolk and Newport News?

"A. Yes.

"Q. What was the best price next to this that was offered to you?

"A. One firm offered it at $25.00.    There were very few people in position to supply.

"Q. Was this the best price that was offered to you in the market?

"A. Yes, sir.

"Q. And what did you buy—the amount mentioned in that bill?

"A. I did.

"Mr. Hickox:    I offer that in evidence."

The bills for the coal purchased for the two steamers just mentioned were filed and are as follows:

"S. S. 'Hurliness' and Owners

"To Maryland Coal and Coke Company, Dr.

"1920                    Newport News, Va., July 26, 1920.

"To—Supplying four hundred and ninety-
four gross tons bunker at $20.00 per ton. . $9,880.00


"Steamship S. S. King City and Owners

"To White Oak Coal Company, Dr.

"of Cardiff, Wales                    1,822 tons register

"Arrived June 26, 1920; Captain    Sailed July 21, 1920

"From Dedford, Eng.                    For Dokar-Africa

"To 669 tons; White Oak; New River

Steam Coal at $16.50 per ton, 2,240

lbs. . . . . . . . . . . . . . . . . . . . . . . . , . . . . . . . . . .    $11,038.50

"2 To Trimming 669 tons at 30c and war

tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    206.72

"10 To Telegrams. . . . . . . . . . . . . . . . . . . . .    .86

"18 To Port charges and war tax. . . . . . .    30.90

                                    "$11,276.98

"Received payment,

"WHITE OAK COAL CO.

"By J. E. WESTERVELT,

"7/26/1920.

"WHITE OAK COAL COMPANY,

"E. E. GARDNER, Resident

.        Manager,

"By M. D. A."


The witness testified to the same facts and filed
similar receipts with reference to the bunkering of
each ship except the five noted above. On cross-
examination he reiterated that he had bought the coal,
after inquiry, upon the market, at the lowest obtainable
prices.

[17] The defendant offered no testimony at all in regard to this evidence showing the damages to the plaintiff. The details of plaintiff's claim had been furnished at the time the petition was filed. Three or four witnesses, connected with the defendant company, testified and none of them were asked about the definite market or selling price at the periods indicated. In all instances except two the coal was purchased from the White Oak Coal Company, which had an office in the vicinity. The evidence is sufficient to show the date of sailing, the name of the ship, the amount of the coal, the price paid, and from whom purchased, and that it was the lowest price reasonably obtainable. There was practically no evidence by the defendant to refute it. Was not the jury bound to be governed by this evidence in the event they found for the plaintiff? We are of opinion that they were, otherwise they could only arrive at an award of damages by conjecture or speculation. It is true the witness was an interested person, but these facts he testified to were circumstances naturally to be expected to follow upon a refusal of the defendant to furnish the coal, and were supplemented by documentary evidence.

On page 47 of 23 Corpus Juris, it is said:

[18] "Uncontradicted evidence should ordinarily be taken as true, and cannot be wholly discredited or disregarded if not opposed to probabilities or arbitrarily rejected, even though evidence tends to establish a fact which it is within the power and to the interest of the opposing party to disprove, if false, his failure to attempt to disprove it strengthens the probative force of the evidence tending to prove it. Uncontradicted evidence is not, however, necessarily binding on the court or jury, but may be disbelieved

where it is contrary to natural or physical laws, opposed to common knowledge, inherently improbable, inconsistent with circumstances in evidence, or somewhat contradictory in itself, especially where the witness is a party or interested, or ·where in the very nature of things it is impossible to secure opposing testimony."

In *Woodward* v. *Squires & Co.*, 39 Iowa, 435, it was held that a jury should not arbitrarily reject the testimony of unimpeached witnesses, which does not lack probability, although they may be interested in the result of the suit; and a verdict in conflict with their uncontradicted testimony cannot be sustained.

In *McNamara* v. *Georgia Cotton Co.*, 10 Ga. App. 669, 73 S. E. 1092, it was held that the testimony of a witness having personal knowledge as to the market value of a commodity at a given time and place is evidence of a substantive fact, and if undisputed will demand a finding that the commodity was of the value fixed by the witness and the jury cannot arbitrarily disregard such testimony and substitute their own opinion as to the value of the commodity.    And see *Tathwell* v. *City of Cedar Rapids*, 122 Iowa 50, 97 S. E. 96.

If, in the instant case, the right of recovery had been withdrawn from the jury, by a demurrer to the evidence or otherwise, it is manifest they could not have awarded damages in an amount not reasonably in accord with the only testimony before them bearing upon that issue.

It has always been the right and the duty of the trial court in Virginia to overrule a finding of a jury plainly contrary to the evidence, or without evidence to support it.    Under the present legislation in section 6251 of the Code the right of the trial court is recognized and extended.

The learned judge of the lower court, in acting upon the motions to set aside the verdict, expressed his views in a written memorandum as follows:

"Upon the motion for a new trial, made on behalf of the defendants, it is only necessary to say that it involves questions decided by the court during the trial and as to these questions the court sees no reason to change its rulings; it only remains, therefore, to overrule the motion of defendant for a new trial.

"The consideration of the motion of the plaintiff to set aside the verdict of the jury, and enter judgment for what they claim to be the proper amount, requires more detailed examination.

"The only question in dispute between the parties on the matter of liability was whether the contract price was that fixed in the written agreement at $6.20, or whether the additional wording 'subject to any revision' made it, under the testimony, the market price. If $6.20 was the price agreed upon then the plaintiff was entitled to recover. But if the market price was the true price agreed upon by the parties then the plaintiff could not recover, and the verdict must be in favor of the defendant.

"The jury, by its verdict in favor of the plaintiff, could only so find under the evidence by concluding that $6.20 was the price agreed upon. They found for the plaintiff, but they seem to have balked at the conclusion to which this decision necessarily led. They arbitrarily fixed the recovery at $28,000.00. This is, under the testimony, an incorrect verdict and must be set aside.

"Under such circumstances what is the duty of the court? Section 6251 of the Code of 1919 provides as follows: 'A new trial shall not be granted if there is sufficient evidence before the court to enable it to

32

decide the same upon its merits, but such final judgment shall be entered as to the court shall seem right and proper.' In passing on this section the Court of Appeals has used the following language: 'The object of section 6251, Code of 1919, is to put an end to litigation, to obviate repeated trials, and the delay and expense of litigation * * *. And to that end the trial court shall enter such a final judgment as ought to be entered, or as the law requires upon the evidence before it. This does not mean necessarily a judgment in favor of the adverse party, it may be in favor of the party obtaining the verdict, but for a different amount from that found by the jury.' *Forbes* v. *Southern Cotton Oil Co.*, 130 Va. page 245, 108 S. E. 15.

"The next question to be determined is, was there sufficient evidence before the court to enable it to decide the case upon its merits?

"The only question before the court as to the price paid for the coal was that introduced by the plaintiff, and it was repeatedly proved that the coal was obtained at the market price prevailing at the time the bunkers had to be filled for each steamship. The defendant seemed to acquiesce in that, certainly he did not attempt to contradict it. That being so, the result is a simple calculation of the difference between $6.20, the price named in the contract, and the price actually paid by the plaintiff as each steamship was bunkered.

"I therefore conclude that there is sufficient evidence before the court to enable it to decide the case upon its merits.

"The last remaining question to be determined is, what final judgment does the law require the court to enter upon the evidence before it? As I said above. This is not a disputed fact; what the particular market price was at the time of each bunkering is not contro-

verted, and is definitely proved by the testimony of witnesses, the receipted bills, and the other documentary evidence introduced by the plaintiff.

"My conclusion then is, that the law requires the court to enter judgment for the plaintiff, for the sum of $98,345.75, with interest from January 1, 1921, that being the amount claimed by the plaintiff after deducting certain amounts of freight increase, etc.

"I will, therefore, enter an order overruling the defendant's motion for a new trial and will grant the motion of the plaintiff to set aside the verdict of the jury and enter judgment for the amount specified above."

[19] The only ground upon which the action of the court in setting aside the verdict and entering judgment for the larger amount is challenged in the petition for the writ of error is that the jury was not bound to accept the testimony for the plaintiff as to the damages, even if uncontradicted evidence. No other question is raised and we pass upon no other. It is argued in the petition that the jury was not obliged to believe the testimony in respect to the market value, bunkering, and damages, but it is fairly apparent that the defendant acquiesced in the deductions from that testimony. The witness, Liley, and the witness, Walden, both testify in substance that the cost of coal increased after the government regulation of price was released, and this appears from the tabulated statement filed by the plaintiff, which shows the highest cost at $20.00 a ton in the latter part of July, 1920, from which time it gradually decreased to $9.00 a ton in December.

We find no error in the rulings of the trial court complained of and, therefore, the judgment is affirmed.

*Affirmed.*