# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## W. L. CHASE AND COMPANY, INCORPORATED, v. NORFOLK NATIONAL BANK OF COMMERCE AND TRUSTS.

December 5, 1928.

At the time of the transactions involved in this case, July and August, 1926, the Norfolk National Bank of

Commerce and Trusts was known as the National Bank of Commerce, engaged in a general banking business in the city of Norfolk, its corporate name having been changed, by reason of a merger with other banking institutions, at the time this litigation was commenced.

W. L. Chase and Company, Incorporated, was a corporation, with its headquarters in the city of Norfolk, engaged in business as wholesale oyster packers and planters. For several years J. P. Hopkins and J. C. Custis were the joint or associate managers of the business, neither of them being on the board of directors, nor otherwise corporate officers. The National Bank of Commerce, at Norfolk, had for some years been the depository and banking house of the Chase Company; and the company carried also an account with the National Bank of Rocky Mount, in North Carolina.

The Chase Company brought an action of assumpsit against the Norfolk Bank, in which it was alleged that a check drawn in its name upon the National Bank of Rocky Mount, payable to the National Bank of Commerce, at Norfolk, on July 21, 1926, in the sum of $3,500.00, had been placed by the Norfolk bank to the personal credit of J. C. Custis, and the amount of the check had been lost to the plaintiff. Upon the trial a jury was waived, and the court, after hearing the evidence, rendered judgment for the defendant.

Hopkins and Custis were the managers of the plaintiff company's business. Hopkins testified that his duties were more or less on the outside, while Custis "looked after the clerical end of the office" and attended to collections and deposits, and so came in contact with the banks and customers in the financial matters of the company. The company had borrowed no money

from the bank since December, 1924, and then only on notes signed by the stockholders, of whom there were only five. In addition to the two managers the company had on its office force a treasurer and a bookkeeper. The latter, as a rule, made out the deposits, while Custis carried the deposits to the bank, though the bookkeeper did sometimes. The company had a check book with printed forms for the checks, and both Custis and Hopkins were required to sign the checks in order to draw money out of the Norfolk bank. On July 21, 1926, Custis came into the bank and handed the teller a deposit slip carrying $3,500.00 to his personal account, together with a check for that amount. The check was as follows:

"W. L. CHASE & CO., INC.

"WHOLESALE OYSTER PACKERS AND PLANTERS,
NORFOLK, VA.

"No. 2081
"ROCKY MOUNT, N. C. 7–21–1926.
"Pay to the order of the National Bank of Commerce...................................$3,500.00
Thirty-five Hundred........................Dollars

W. L. CHASE & CO., INC.
"By J. C. Custis.

"For
"To THE NATIONAL BANK OF ROCKY MOUNT,
"ROCKY MOUNT, N. C."

The check was endorsed by Custis, and went to his individual credit. The check was forwarded to the Rocky Mount bank for payment, and was there paid on July 25th, and so collected by the Norfolk bank. It then bore the following endorsements:

"J. C. CUSTIS
"Pay any Bank, Banker or Trust Company
"All prior endorsements guaranteed

"July 21, 1926

"The National Bank of Commerce

"68–36 of Norfolk, Va. 68–36

"A. E. Wharton, Cashier.

"Pay to the order of any bank, banker or Trust Company

"Prior endorsements guaranteed

"July 22, 1926

"Federal Reserve Bank

"68–3 of Richmond 68–3

"(Check is Stamped Paid.)"

Upon an auditing of the company's books, a few days afterwards, the first week in August, a discrepancy was discovered, and upon examination of the account with the Rocky Mount bank this check on that bank was disclosed. Further investigation showed that many other items had been wrongfully used by Custis, causing a loss of quite a large amount to the company, and Custis was insolvent. The Norfolk bank was immediately notified of the fraudulent use of the check and demand for restitution made upon it, which was refused. Custis had been carrying his individual private account with the Norfolk bank, and on July 21, 1926, he had to the credit of that account $63.01, at the time the amount of the check was credited to it. He was indebted to the bank in the sum of $900.00 upon a note executed June 24th at thirty days, to become due July 24th, this note having been for a larger amount and been renewed in June upon a curtail being made. During the summer of 1926, prior to July 21st, Custis had made application to the cashier for a further loan, which had been refused. Custis proceeded to put himself in possession of the fund, which had been thus diverted to his private account, very rapidly. He drew checks on it as follows: July

21st check for $325.50 to order of Trant Motor Co.; July 21st to cash for $350.00; July 22nd to cash for $100.00; July 23rd to cash for $400.00; July 24 to cash for $1,500.00, and July 27th for $800.00; leaving a balance of $57.51 on the last mentioned date, which the bank credited on his $900.00 note after his fraud and insolvency came to light.

*W. W. Starke* and *Jas. G. Martin*, for the plaintiff in error.

*Tazewell Taylor*, for the defendant in error.

CRUMP, P., after making the foregoing statement delivered the following opinion of the court:

The plaintiff in error insists that Curtis was not in the position of a general agent with unlimited authority to dispose of the funds of a principal, in the name of the principal, without limitation; that he was an employee of the corporation, handling the funds of the corporation only for its business purposes; that the fraudulent check, drawn to the order of the defendant bank, made the endorsement of the bank necessary for its collection, and when the bank endorsed it, and at the request of Custis placed it to his credit, it so enabled Custis to consummate the fraud and by its action participated therein; that in so doing it was guilty of gross negligence and breach of its duty towards its depositor.

The position of the defendant is that the circumstances imposed no duty upon the bank to hesitate or to make an investigation before complying with the direction of Custis, who was the agent of Chase and Company, to place the check to his private account; that the fact of the check being drawn in favor of the

depository bank was merely in pursuance of the usual mode of transferring funds from one bank to another, and was not notice to the bank that wrong was contemplated; that the principal, Chase and company, should ultimately bear the loss, caused by the wrongdoing of its agent, rather than the bank, which should be considered an innocent party.

Various cases were referred to by counsel in argument as authority for their respective contentions, and it will be instructive to analyze one or more of the leading authorities so far as may be consistent with the proper limits of a judicial opinion.

In *Whiting* v. *Hudson Trust Company*, 234 N. Y. 394, 138 N. E. 33, 25 A. L. R. 1470, several checks were involved, one drawn by Eckerson (the party committing the fraud) as attorney under a broad power of attorney conferring authority to make and indorse paper, borrow money, keep banking accounts, to make deposits and draw against the accounts, this check was upon another banking institution which has certified it, signed in the principal's name by Eckerson, attorney in fact, and payable to Eckerson, trustee, and in that capacity was endorsed by Eckerson; it was then at his instance deposited by the trust company to an account in his individual name marked "special." Upon the death of the principal in the power of attorney, Eckerson became one of the executors. He then endorsed and had credited to the same account other checks made payable to his order as executors. He drew upon this account and made wrongful use of the monies he had so deposited. The court held that the trust company was not liable for the loss of the money upon any of the checks.

The decision was based mainly upon the fact that Eckerson as payee of the checks was the lawful holder

and owner of the same, although "trustee" or executor was appended to his name, and therefore upon his endorsement in the name by which he held the checks, it was the duty of the bank to pay him the cash over the counter, or deposit the checks as he directed. "In such a situation (says the court) the defendant is to be held liable, if at all, only upon a showing that by the form of the account it has facilitated a conversion and made itself, in so doing, a party to a tort (*Allen* v. *Puritan Trust Company*, 211 Mass. 409, 422 [97 N. E. 916, L. R. A. 1915C, 518]; *Squire* v. *Ordemann*, 194 N. Y. 394 [87 N. E. 435]). But nothing that was done by the defendant did facilitate a conversion. Eckerson was the payee of the check, with power to collect it. His power was neither increased nor diminished by the form of the deposit. He was the owner of a chose in action whether subject to a trust or free from one." Again: "A different question would be here if the trust company had received the check for its own use, as, for example, in payment of a debt (*Bischoff* v. *Yorkville Bank*, 218 N. Y. 106, 112 [112 N. E. 759, L. R. A. 1916F, 1959]; *Ward* v. *City Trust Company*, 192 N. Y. 61 [84 N. E. 585])."

A similar conclusion was reached in a lucid opinion delivered by Judge Wm. A. Moncure, of the Chancery Court of the city of Richmond, in the case of *Life Insurance Company* v. *National Bank*, reported in 6 Va. Law Register (N. S.) 106. The check in that case was drawn upon the bank by a customer of a real estate corporation, and made payable to the corporation by name with the addition of the word *agents*. The check was endorsed in the exact designation of the payee "by Wm. B. Pizzini, Treas." The bank, at the request of Pizzini, deposited the check to his individual credit. The real estate agency was a close corporation,

practically owned by Pizzini, and he had authority as treasurer to sign and endorse all notes and checks. The court held at the suit of the drawer of the check, the corporation being insolvent and not disclaiming the act of its agent, that the check being properly endorsed, Pizzini was the legal holder when he presented it at the bank, concluding "for the above reasons, I do not think, as a matter of law, the defendant bank is liable, because it simply cashed the check for Pizzini, or what is the equivalent, placed it to Pizzini's personal credit when so presented endorsed in bank, that is payable to bearer, and thereafter, without receiving part of the money, allowed it to be checked out by Pizzini personally."

To the same effect is the case of *United States Fidelity & Guaranty Company* v. *Home Bank*, 77 W. Va. 665, 88 S. E. 109, in which several checks payable to one Boring, Admr., were endorsed by him and deposited to his individual account; the court says: "The checks were payable to Boring, Administrator; he had absolute dominion over them, and of the proceeds thereof. He was authorized to collect the money from the bank on which they were drawn, and deposit it according to his pleasure in any other bank, or he could deposit the checks to his credit, individually, or any other way, without thereby rendering himself liable as for a breach of trust, and the *descriptio personae* in the checks would not be sufficient to charge the bank of deposit with notice of a breach of trust, nor render it liable to see to it that funds were not withdrawn for misappropriation."

To the same effect is *Kendall* v. *Fidelity & Trust Company*, 230 Mass. 238, 119 N. E. 861.

In the recent case of *Cocke's Admr.* v. *Loyall*, 150 Va. 336, 143 S. E. 881, the foregoing authorities are fol-

lowed. The checks there were signed by Loyall as executor, and by his direction were placed to his individual credit. Loyall, though executor, was master of the situation, and had an absolute right to the control of the funds of the estate, and the bank was not liable unless it knew of or participated in a misappropriation of the funds of the estate by the executor. *Life Insurance Company* v. *National Bank, supra,* is referred to with approval. The court says, alluding to cases cited *contra:* "Upon an examination of the other cases cited it will be observed that the banks were held liable because there was a violation of the contract of deposit, or the money was erroneously paid out."

See also *McCullam* v. *Third National Bank,* 209 Mo. App. 266, 237 S. W. 1061; *Duckett* v. *Mechanics' Bank,* 86 Md. 400, 38 Atl. 983, 39 L. R. A. 84, 63 Am. St. Rep. 513.

Other cases illustrative of these doctrines are referred to in 4 Virginia Law Review, 153.

The foregoing line of authorities establishes clearly that a trustee, executor or other fiduciary, authorized to receive, hold and draw upon trust funds, may draw and endorse checks upon the trust funds, payable to bearer or to himself, as fiduciary, and may have such checks deposited to his own account. In such cases when the bank has no actual or constructive notice of fraud or misdoing on the part of the fiduciary, who is one of its depositors, if the bank acting in good faith merely credits the personal account of the fiduciary with the checks, this does not make the bank liable if the fiduciary afterwards misappropriates the deposit. However, this general rule is subject to the limitation that if the bank takes a benefit by reason of the deposit to the fiduciary's credit, such as the payment of a debt from him to it, or otherwise participates

in the diverted use of the trust funds, then the bank is liable. We do not think, however, that the liability of the bank in the instant case is to be judged by the doctrines thus enunciated, as is argued on behalf of defendant in error. As a rule the cases referred to were suits in equity dealing with the misappropriation of trust or fiduciary funds by the person entrusted with their custody and control, and seeking to ascertain the liability of the bank as a third party participating in the fraud or being benefited by it. In the instant case, there is no liability asserted against the bank upon the mere ground that the checks of Custis upon his private account were honored by the bank, and that the fund derived from the deposit of the check to his account were impressed with a trust. The liability of the bank must be viewed from a different angle.

 The question here is whether the manner in which funds, necessarily funds of the plaintiff company were placed or allowed to be placed to Custis' credit was such as to involve participation on the part of the bank in the diversion of the plaintiff's funds to another party, and so the bank joined in a *quasi* conversion of the plaintiff's property. The relation between a depositor and the bank is that of debtor and creditor. When a check is deposited for collection, the ownership of the check is not transferred to the receiving bank, but it is the agent of the depositor until collection is made, and not until then does it become the debtor of the depositor. *Miller* v. *Norton*, 114 Va. 609, 77 S. E. 452; *Blair* v. *Hill*, 50 App. Div. 33, 63 N. Y. S. 670 (affirmed 165 N. Y. 672, 59 N. E. 1119). When the check in this case was accepted by the bank for collection from the bank of Rocky Mount, was the crediting of the amount to the account of Custis an unauthorized and ineffective act, and did the bank

upon payment by the Rocky Mount bank hold the proceeds for the benefit of the drawer, W. L. Chase and Company, as the virtual depositor? As indicated in *Cocke* v. *Loyall, supra,* a bank may be liable for violation of its contract with a depositor.

In *McCullam* v. *Third National Bank, supra,* the court says:

"These and other Missouri cases cited under this point do not, as we conceive the law therein expressed, go to the extreme here contended for, to-wit, that a bank in the ordinary course of business, without any actual knowledge of conversion, or without any further constructive or implied knowledge than the mere fact that a check drawn by an officer of a corporation on its funds is deposited in his individual account, becomes liable if it turns out that such deposit is a step in the conversion of the corporation's funds. *The facts in a given case, of course, and, indeed, only slightly different from the facts here, may be* such as to place the bank on guard." (Italics ours).

In *Graham* v. *Southington Bank and Trust Company,* 99 Conn. 494, 121 Atl. 812 (1923), it is stated in the syllabus: "A check drawn upon one bank and payable to the order of another, confers no authority upon the latter to pay the amount of the check in cash to an agent of the drawer; nor does the mere possession of the check by the agent warrant such payment." In that case the court held that such a check upon its face imported the ownership of the drawer in the money represented by it, and the desire of the drawer that its custody should be transferred from the bank holding it to the payee bank; that the form of the check did not warrant the payee bank in supposing that the drawer intended the check to be paid to the agent or to place him in possession of the fund; if the drawer

had so intended, the check would have been made payable to the order of the agent, and there would have been no need for the agency of the payee bank in the transaction. The court adds: "The use of the bank as payee of the check indicated the drawer's intention to lodge the money in its custody and place it under its control, and nothing further was inferable from the language of the check." These observations consist with good law and are consonant with sound sense.

In *Stainback* v. *Bank of Virginia*, 11 Gratt. (52 Va.) 269, Stainback, under a written power of attorney, was given authority to sign his principal's name to checks upon the Bank of Virginia, and in the principal's name to make and endorse negotiable notes and bills of exchange, payable to that bank. Under this power of attorney, three bills of exchange were drawn by Stainback upon one Claggett, of London, and, as usual in his transactions, he endorsed the bills in the name of his principal by him as attorney. Such bills were frequently negotiated at the bank upon the credit of the principal, and were accepted and paid by the drawees. The amount of the three bills in controversy were passed to the individual credit of Stainback, and acceptance and payment was subsequently refused by the drawee. Thereupon, the bank sued the principal in assumpsit on account of his endorsement by attorney appearing upon the drafts. The jury, upon instructions given, found for the plaintiff bank, and judgment was entered accordingly. The case was reversed for the refusal of the trial court to instruct the jury that if they believed that the agent in making the endorsement was not acting in the principal's business, but for the agent's own benefit, then they should find for the defendant, as the power of attorney did not authorize the agent to endorse the

principal's name on the bills for the agent's accommodation. It is pointed out by defendant in error in the instant case that Stainback, the agent, was indebted to the bank at the time the bills were discounted. The decision of the court, however, was not rested upon that fact. The court says: "In every stage of the proceeding with which the bank was connected, it was perfectly apparent that the business of the agent, and not of the principal, was to be promoted." The court further holds: "It will not do to say that the agent might, by a certain disposition of the proceeds, have indemnified his principal; and that the bank could not know that he would not do so. The answer is obvious, that the proceeds of the bills were at once applied to his own benefit on the books of the bank, with its full knowledge and consent. If the possibility that an agent may indemnify his principal against abuse of power may be relied on to bind the principal, the practical and beneficial effects of limitations in powers will be destroyed; for in every case the agent may possibly indemnify his principal against such abuse."

The recent case of *Empire Trust Company* v. *Cahan*, 274 U. S. 473, 47 S. Ct. 661, 71 L. Ed. 1158, was decided by the supreme court in a succinct and incisive opinion. This opinion appears, transcribed in full, in Judge Campbell's opinion in *Cocke's Admr.* v. *Loyall*, *supra*. Cahan, Sr., a Canadian lawyer of wealth and distinction, gave powers of attorney to his son, Cahan, Jr., authorizing him to draw upon the accounts of the father in the Bank of Montreal and the Guaranty Trust Company, of New York. These powers, says the court, were "general, and with no qualification as to the purposes for which such checks might be drawn." These powers, in fact, constituted the son the *alter ego*

of the father and authorized him to do anything in all respects in connection with the funds of the father in these two depositories, that the father himself could do. These documents were executed in 1916. Beginning in July of that year and from that time down to October, 1918, the son drew checks signed with the father's name by himself as attorney against his father's two accounts, seventeen payable to his own order, three to the order of the Empire Trust Company, and deposited them to his own private account with the latter Trust Company. The funds thus to the account of the son were drawn out by him and applied to his own use. The Empire Trust Company had no knowledge that the son was misappropriating his father's money and no notice other than that given by the form of the checks. The court says: "The petitioner (Empire Trust Company) had notice that the checks were drawn upon the defendant's account, but they were drawn in pursuance of an unlimited authority. We do not perceive on what ground the petitioner could be held bound to assume that checks thus lawfully drawn were required to be held or used for one purpose rather than another * * *. He put his deposits absolutely into his son's power, and the son, if he drew currency, as he might, could do with it as he saw fit. The notice to the bank was notice only of the relation of the parties."

The court also alludes to the apparent acquiescence of the father in these transactions of the son. "For, in addition to what we have said, the transactions went on for over two years, and the petitioner fairly might expect the respondent to find out in a month or two if anything was wrong. Careful people generally look over their bank accounts rather frequently." The law is well settled that a principal who neg-

lects to promptly disavow an act of the agent, transcending the latter's authority, makes the act his own, and that such ratification is to be presumed from the absence of dissent. *Piedmont, etc., Company* v. *Buchanan,* 146 Va. 617, 131 S. E. 793.

We perceive no radical disagreement by the high tribunal, in its opinion in the *Cahan Case,* with the doctrines of the Connecticut and New York courts in the matter of the authority of the agent of a corporation, to accomplish their deposit to his credit, under circumstances which are sufficient to impute notice to the corporation of their unauthorized misappropriation. The vital distinguishing features between that case and the instant case are two-fold. In the *Cahan Case* the agent had actual authority to deal with the principal's funds as he chose; he could place them all to his own credit in any manner he selected. In the *Cahan Case* the checks he made payable to the depository bank were for the transfer of funds of the principal from the drawee bank to a bank in which the agent had his individual account, *but the principal had no account.* The question of notice to the bank receiving a check payable to itself for collection was there presented in a very different aspect from the question as presented here, excluding the inferences naturally deducible from the facts of the instant case.

The liability of the bank in the instant common law case is to be determined largely upon the law of agency as applied to the transactions of an agent with the depository bank of the principal. Though, of course, the fiduciary character of the agent's position and the element of trusteeship are involved in the relation of principal and agent; and equitable considerations are frequently given weight in such cases, even in the common law court.

In the instant case the teller of the trust company, who received the deposit from Custis, was placed upon the stand by the plaintiff as an adverse witness, but was asked very few questions. He stated he was twenty-seven years old; had been with the bank for two years; that he took the slip and check from Custis and credited the amount to his personal account; he made no inquiry concerning the transaction and didn't question the check; had known Mr. Custis since he had been with the bank; knew him as the manager for Chase and Company; and the one who made deposit and withdrawal for the plaintiffs; he couldn't recall that he had a previous transaction anything like this with Custis. He was not asked whether he examined the check and understood its purport, or whether he merely noticed Custis' personal endorsement of the check and nothing more. The check was evidently passed on to the collection department, endorsed by the bank and transmitted for collection. It is shown that in order to draw funds to the credit of Chase and Company from the Norfolk bank, the custom was for both Hopkins and Custis to sign the checks. It is not shown that this applied to checks upon the Rocky Mount bank. Presuming, therefore, that the name of Chase and Company was properly signed to the check, it was on its face an order to the bank to collect the amount from the Rocky Mount bank to be placed to the credit of the account of Chase and Company in the Norfolk bank, with which it had kept its account for several years. The check could not be made available for this or any other purpose without the endorsement of the Norfolk bank. When the bank endorsed it and so made it collectible, if the proceeds were given to Custis or anyone else it was a diversion from the proper disposition of the fund, and the bank remained liable to

Chase and Company for the amount of the check as soon as the money came in the possession of the bank from the Rocky Mount bank, and upon a failure to pass the proceeds to the account of Chase and Company. Whatever may have been the authority of the bank to receive and pay a check payable to either Hopkins or Custis individually, and drawn in the name of Chase and Company, the paper in question and its handling constituted a most striking departure from all previous dealings between the bank and Custis as the manager or agent of Chase and Company. It was not within the apparent scope of any authority possessed by Custis, and the suggestion of Custis that the fund in question be turned over to him by passing it to his personal account should have awakened distrust in the minds of the bank's officers. By complying with his request the bank manifestly allowed him to exceed his authority and so participated in the diversion of funds under their control. If Custis had presented the check to the Rocky Mount bank for payment over the counter, that bank would naturally have refused payment until endorsed by the Norfolk bank. The endorsement of the Norfolk bank would have been a direction to pay to Custis or to bearer, and would have carried responsibility of the Norfolk bank. It is difficult for the court to conceive why the bank allowed this transaction to take place in the manner it did—unless, indeed, the bank's officers simply failed to examine and notice the plain purport of the check. Everything on its face was in print, except the date, the signature of Custis to the name of Chase and Company, and the name of the payee. These few written portions were thereby rendered more prominent. There is nothing in the record to justify a finding that Custis had such authority to deal with the funds of Chase and Company as was

conferred by the powers of attorney in some of the cases referred to herein, where the agent was empowered to deal with the monies of the principal in all respects, and entrusted with the same control over them as possessed by the principal. As manager of the corporation's business he was empowered to collect, use and disburse the corporate funds in the corporate name for corporate purposes in the business of the corporation. He was not authorized to put the corporate funds in his own pocket and use them at will.

We agree with the expressions in some of the cases, that banks are essential factors of modern business life, and their transactions, particularly in large financial centers, are not to be clogged or their pace slackened by over-burdensome restrictions. But in a clear case of loss caused to a depositor by transactions in which they participate, whose legality cannot be sustained, the courts should not hesitate to compel restitution.

We have given this case full and careful consideration, and, for the reasons stated, are of opinion to reverse the judgment of the lower court, and render judgment here in favor of W. L. Chase and Company for $3,500.00 with interest from August 1, 1926, and the order to that effect will be entered.

*Judgment reversed.*