# Richmond.

## TRUST COMPANY OF NORFOLK v. JOHN C. SNYDER, ET ALS.

### March 21, 1929.

The opinion states the case.

*Wm. L. Parker, Hugh C. Davis* and *Hugh W. Davis,* for the plaintiff in error.

*Ernest S. Merrill,* for the defendants in error.

HOLT, J., delivered the opinion of the court.

This case has been once before considered by this court, and is reported in 148 Va. 381, 138 S. E. 477. The circumstances out of which it arose are there set out in detail and need not be restated here. It is sufficient to say that E. N. Fuller was treasurer of the Knox Presbyterian Church of Norfolk, and a member of its board of deacons, from April, 1920, to June, 1923, the date on which his embezzlements first became known, and during all of that time was its esteemed and trusted officer.

In April, 1920, the church opened a bank account with the defendant. Negotiations relative to it were conducted by Fuller in his official capacity and the authorized signature used from the beginning, in all its varied forms, up to and through the period of defalcation, was "Knox Presbyterian Church, E. N. Fuller, treasurer."

Different accounts were kept, but it is not necessary to restate them. That with which we are first particularly concerned was opened on June 1, 1922, when $6,000.00 was deposited specially. At the same time the church borrowed from the bank $3,400.00, which sum was likewise deposited to the credit of this account, and on the same date it purchased through the bank a $10,000.00 note, known in the record as the Moss note. This account was subject to the check of

Fuller, treasurer, as were all the others. All deposits to its credit were checked out on the same day, June 6, 1922, and deposited to the credit of a general account.

On September 18, 1922, Fuller discounted to the bank a note signed "Knox Presbyterian Church, by E. N. Fuller, treasurer," in the principal sum of $500.00. On October 16, 1922, a similar note for $500.00 additional was discounted. On October 25, 1922, a similar note for $600.00 was discounted. On November 14, 1922, a similar note for $570.00 was discounted, and on February 7, 1923, a simi'ar note for $225.00 was discounted. The $600.00 note was renew on April 23, 1923.

The proceeds of these notes, as they were discounted, went to the credit of the general account, and were afterwards withdrawn by Fuller, treasurer, and appropriated to his own use.

During all of this period the Moss note was held by the Trust Company as collateral to secure the $3,400.00 loan. It was purchased before maturity by the bank, which deducted from its proceeds the $3,400.00 note and the aggregate amount of the notes discounted by Fuller and placed to the credit of the plaintiffs the balance due under this method of accounting, in amount, $3,693.14. This sum plaintiffs declined to accept in full settlement, and claimed in addition $2,719.53, that being the principal amount and interest represented by the discounted Fuller notes.

From all of this it appears that the issue is, should these credits or setoffs be allowed? It was the duty and it was the custom of the church to examine Fuller's accounts from time to time. They were balanced and vouchers delivered by the bank on August 21, 1922, on December 30, 1922, on January 20, 1923, on May 2, 1923, and on June 13, 1923, and not until June, 1923, were his misdoings discovered.

What weight is to be given to the opinion already delivered in this case?

In *Norfolk & Western R. Co.* v. *Mills and Fairfax*, 91 Va. 613, 22 S. E. 556, the court said: "But whatever force may be attributed to the rule of *stare decisis*, and however respectable may be the authority upon which it rests, the principle itself is subordinated to another rule which declares that a case having been once determined in this court every proposition of law then decided is binding upon this court whenever that case comes before it for adjudication. In the one instance the cases are followed as precedents; in the other they are recognized not only as the law, but *res judicata*, that is an adjudication of the matter in controversy." *Director General* v. *Gordon*, 134 Va. 381, 114 S. E. 668.

At the first trial, this instruction was given for the plaintiffs: The court further instructs the jury as a matter of law that E. N. Fuller, by virtue of his office as treasurer of the Knox Presbyterian Church, had no right or authority to execute on behalf of the trustees of the Knox Presbyterian Church the notes in question, and if the jury believe from the evidence that the said E. N. Fuller did execute said notes and attempted thereby to place the Beverley G. Moss note of $10,-000.00 as collateral security for said notes without authority from the board of trustees of the Knox Presbyterian Church, they shall find for the plaintiff."

It was held to be error. The court said: "The instruction as given proceeds on the theory that all that was done by Fuller was the discounting of the notes, theft of the proceeds, and placing, without authority of the church trustees, the Moss note as collateral security.

"As a matter of fact, the Moss note is of little importance in the transaction. Had Fuller, without

authority, executed the notes in behalf of the trustees of the church, discounted the same and immediately appropriated the money, then the defendant would have to bear the loss resulting from its negligence in failing to inquire into the authority of Fuller to execute notes on behalf of the church. But such is not the case. The proceeds derived from the discounted notes, instead of being immediately appropriated by Fuller, were deposited with the defendant, to the credit of the Knox Prespyterian Church, intermingled, no doubt, with other funds of the church, and withdrawn at intervals by means of checks signed by Fuller in the manner authorized by the church authorities. The authorities, upon whom devolved the duty of settling the affairs of Fuller as church treasurer, had access to the frequent statements rendered by the bank, and to the cancelled checks evidencing the theft of the money."

And again: "It is a well settled principle of law that a bank depositor is under the legal duty to examine with reasonable diligence the statements rendered him by the bank and the vouchers returned therewith, and to report any errors detected within a reasonable time."

Of course, Fuller knew all that had been done, and it was to him that the vouchers were delivered. But it was also the church's duty to check them up. This duty it recognized and had from time to time made such examinations. Why it was not made in the instant case, or, if made, why the trouble was not discovered, does not appear. This instruction was tendered on behalf of the defendant at the first trial and rejected:

"The court instructs the jury that if they believe from the evidence that the sum of money set forth in the defendant's claim of setoffs were advanced by the

defendant and placed to the credit of the checking account of the Knox Presbyterian Church with the defendant, and if they believe from the evidence that from time to time the said defendant furnished the said Knox Presbyterian Church, its trustee, or treasurer, with itemized statements of said account and vouchers attached showing deposits and withdrawals therefrom, and that the Knox Presbyterian Church or its representatives did not use reasonable care to ascertain and notify the defendant within a reasonable time that said amounts had been advanced on unauthorized notes signed by the treasurer, Fuller, and equivalent amounts withdrawn by the said treasurer, Fuller, without legal authority, then they must find for the defendant."

Its rejection was held to be erroneous. It is also pertinent to remember that it was the custom of the church to borrow money from the bank from time to time. Mr Ford, one of the deacons, testified:

"Q. Mr. Ford, had the board of deacons authorized the borrowing of any money from the bank?

"A. We have borrowed money from time to time. I say from time to time, but I don't mean so very frequently, but I presume that the treasurer was given authority.

"Q. Do you know he was given authority?

"A. The minutes of the meeting would show that. As well as I recall, it was."

The notes for these loans did not have to be countersigned, and all that Fuller had to do was to secure an endorser satisfactory to the bank.

In remanding this case to the trial court, this court said: "Considering the course of dealing between the parties, the fact that Fuller was held out to the defendant as the trusted representative of the church; the deposit of the proceeds of the discounted notes to the credit of the church account; the rendition of

statements in due course to the proper authorities; we are of the opinion that the question, whether or not the plaintiffs or defendant were remiss in their duty, is a mixed question of law and fact and should be submitted to a jury for determination, under proper instructions which leave the jury free to pass upon the question."

Due diligence was necessary. "The plaintiffs owed to the defendant the duty of exercising due diligence to give it information that the payment was unauthorized; and this included not only due diligence in giving notice after knowledge of the forgery, but also due diligence in discovering it. If the plaintiffs knew of the mistake, or if they had that notice of it which consists in the knowledge of facts which, by the exercise of due care and diligence will disclose it, they failed in their duty; and adoption of the check and ratification of the payment will be implied." *Bank* v. *Richmond Electric Co.*, 106 Va. 347, 56 S. E. 152.

Here no diligence at all was shown and at the retrial no explanation of its absence was offered.

Of course the bank cannot be charged with liability unless it was negligent in the performance of some duty imposed by law. In the execution of these notes it had no part, and it incurred no liability in discounting them and in placing their proceeds to the credit of the church. If it were negligent at all, it was negligence attendant upon withdrawals. Was there anything to put it upon notice or to justify it in a refusal to pay any of Fuller's checks?

Fuller had, from time to time, borrowed money from this bank when properly authorized to do so. There is nothing to show that he or the church ever exhibited such authority, or deemed it necessary. Notes were executed, their proceeds checked out by him, and

payment made all in due course; and so when these fraudulent notes were presented, the bank might well have believed that it was but the continuation of an established custom, the only difference being that they were not endorsed. The reason of their acceptance in this form, however, was that the bank was under the impression that the Moss note, which it held as collateral, made them good.

When we come to the actual misappropriation of this fund, the manner in which it was done is material. Had Fuller on each occasion checked out on his own account the net proceeds of these discounted notes, the recurrence of such conduct might well have excited suspicion, but that was not his course of dealing. Mr. Lamb made the audit which uncovered the fraud. His evidence is in part as follows:

"Q. You have testified that the proceeds of the notes, including the Sunday collections, that has been testi-- fied to by Mr. Ford, along with the interest on the Beverly G. Moss note, were intermingled and jumbled up in the same account?

"A. None distinguished from the other.

"Q. And that Fuller was drawing checks on these accounts, on his account; that is true?

"A. Yes.

"Q. In the ordinary and daily course of business?

"A. Yes.

"Q. What specific withdrawals did Fuller make illegally?

"A. He had drawn a number of checks and had manipulated it and he would issue duplicate checks. There were several vouchers there, checks drawn in payment of local items, such as salaries of the pastor and choir, and all of those things, and then there was money drawn in addition to that on these duplicate

checks that were not used in paying for any obligations of the church, so that is the money he took to himself.

"Q. What do you mean by duplicate checks?

"A. I mean by that when he would go to his bank book he might draw a check payable to our pastor for his salary and then he might issue another check, a counter check, and number it the same, the same number this one was, and he would appropriate that money to himself.

"Q. He would write it, but how would he get it cashed? Would he write it to himself?

"A. To himself yes, or sometimes it would be—I don't remember. I haven't got the checks before me and I don't know whether they were to himself or payable to cash. I think most of them were payable to cash probably.

\* \* \* \* \* \* \* \* \*

"Q. About these checks, Fuller was drawing out, would he draw them in the same amount as the amount of the notes he was putting in the bank?

"A. No, sir; he didn't draw—he spread them over.

"Q. To cover up. But certainly if the Knox Presbyterian Church had known Fuller was putting the notes in it would have called the bank's attention to the fact?

"A. Yes."

From this it appears that the withdrawals were, in the main, on checks payable to cash and were "spread" in such a manner as to conceal from the bank the fact that they were fraudulent withdrawals against fraudulent deposits.

In *Bischnof Adm'x, etc.* v. *Yorkville Bank*, 218 N. Y. 106, 112 N. E. 759, L. R. A. 1916F, 1059, the Court of Appeals of New York said: "We do not consider the question, because it is not here, as to whether or not

a bank would be protected in honoring a check of a fiduciary depositor, regularly drawn upon his account as such fiduciary, and presented by him, even though it had actual notice that he would misappropriate the proceeds. The decisions are not uniform upon this question."

*Duckett* v. *National Mechanics' Bank*, 86 Md. 400, 38 Atl. 983, 39 L. R. A. 84, 63 Am. St. Rep. 513, is a leading case   A debt due to a trustee was paid by a check in these words:

"State of Maryland.

"Citizens' National Bank of Laurel, Laurel, Maryland, September 17, 1892.

"Pay to the order of James Scott, cashier, $2,024.30, two thousand and twenty-four and thirty one hundredths dollars, to deposit to the credit of Henry W. Clagett, trustee.

"C. H. STANLEY."

Its proceeds were placed by the bank to the credit of the personal account of the trustee and checked out by him.   The bank was held liable.   It was said that the check itself was, in substance, an explicit instruction to the bank not to place the funds to the credit of the trustee's personal account, and that in doing this it participated in the breach of trust.   The court, however, did go on to say:   "Had the bank opened the account for this fund in the name of Clagett, trustee, instead of entering the credit to his personal account, it would have done what it was its plain duty to do, and it would not have been guilty of the error which it did commit.   Had it done its duty, and had Clagett afterwards withdrawn the money, as he might have done, and had he then misapplied it without the cooperation of the bank, there would have been no liability incurred by the bank at all."

This court had occasion to consider a somewhat similar question in *Cocke's Admr.* v. *Loyall*, 150 Va. 336, 143 S. E. 881. There Loyall was appointed executor in Louisa county under a will afterwards held to be a forgery. His decedent had money on deposit in a Richmond bank. On that account he drew two checks, signed by himself as executor, one for $1,-680.00, payable to the First National Bank of Louisa, and the other for $322.11, payable to the Bank of Louisa. Their proceeds were placed to the credit of Loyall by the respective banks and appropriated to his own use. The court held that they were not liable, and in the course of its opinion said: "The questions of fraud and payments being thus eliminated, the question presented for our determination is whether the defendant banks rendered themselves liable to the complainants when they accepted the checks from Loyall, under the circumstances detailed, and deposited the proceeds thereof to his personal account. In sustaining the demurrer of the defendant banks, we are of the opinion that the action of the trial court is sustained by the great weight of English and American authority. The burden was on the appellants to establish fraud upon the part of the defendants in honoring the checks of Loyall, or to show that they derived a pecuniary benefit from their dealings with him."

In the recent case of *W. L. Chase & Co.* v. *Norfolk Nat. Bank of C. & T.*, 151 Va. 1040, 145 S. E. 725, the Special Court of Appeals, speaking through Judge Crump, makes this statement of the law: "The foregoing line of authorities establishes clearly that a trustee, executor, or other fiduciary, authorized to receive, hold and draw upon trust funds, may draw and indorse checks upon the trust funds, payable to

bearers or to himself, as fiduciary, and may have such checks deposited to his own account. In such cases, when the bank has no actual or constructive notice of fraud or misdoing on the part of the fiduciary, who is one of its depositors, if the bank acting in good faith merely credits the personal account of the fiduciary with the checks, this does not make the bank liable, if the fiduciary afterwards misappropriates the deposit. However, this general rule is subject to the limitation that if the bank takes a benefit by reason of the deposit to the fiduciary's credit, such as the payment of a debt from him to it, or otherwise participates in the diverted use of the trust funds, then the bank is liable.''

The court in that case did hold the bank liable, but on a state of facts in no wise like this in judgment.

The rule as to benefits is thus stated by the Lord Chancellor in *Gray* v. *Johnston*, L. R. 3 H. L. 1: "In order to hold a banker justified in refusing to pay a demand of his customer, the customer being an executor, and drawing a cheque as an executor, there must, in the first place, be some misapplication, some breach of trust, intended by the executor, and there must, in the second place, as was said by Sir John Leach, in the well-known case of *Keane* v. *Roberts*, 4 Madd. Ch. 357, 20 Revised Rep. 306, be proof that the bankers were privy to the intent to make this misapplication of the trust funds. And to that I think I may safely add, that if it be shown that any personal benefit to the bankers themselves is designed or stipulated for, that circumstance, above all others, will most readily establish the fact that the bankers are in privity with the breach of trust which is about to be committed.''

There is nothing in the record, by remotest implication, to suggest that the bank was benefited directly

or indirectly by these withdrawals. Fuller was the trusted officer of the church and his power to draw upon this account was in no wise limited. The withdrawals were framed, spread in a manner to avoid suspicion. From all of this it appears that banks in such transactions are not liable unless they are beneficiaries, or aid in the fraud, or have knowledge of it, actual or constructive when perpetrated.

An examination of the notes listed makes it manifest that no offset was allowed for three notes, and the failure to make such an allowance was the basis of the jury's verdict, as the followng tabulation clearly shows:

| Date | Prin. | Int. | |
|---|---|---|---|
| Sept. 18, 1922... ... | $ 500.00 | $ 71.66 | |
| Oct. 16, 1922....... | 500.00 | 71.66 | |
| Dec. 22, 1922....... | 570.00 | 71.69 | |
| | $1,570.00 | $225.01 | $1,795.01 |

The verdict for $1,795.01 is illogical and it is not easy to understand how it was reached. If the $225.00 note and $600.00 note were proper offsets, then the other notes were. There would have been some reason in charging the bank with the last note on the theory that the church had not had due time in which to examine the accounts, but to allow this as a credit and to disallow the first note is illogical. The same reasons which led the jury to allow as offsets the proceeds of the $225.00 note and of the $600.00, should have compelled it to deal in like manner with all of the others. We are unable to see wherein the bank was in any degree negligent, and we do think that the failure of the church to follow its established custom and to check the accounts of its treasurer and to verify

his vouchers was. No excuse for its failure to do so has been offered.

Much has been said on behalf of the plaintiffs about the Moss note, but we are of opinion now, as we were when the case was first heard, that it has little bearing upon the issue here. Had it never been in existence, it would probably have been bad banking to have discounted these notes without security, although the position which Fuller held in the community, the time during which his account had been running, and its nature, would have been a measurable excuse for doing so. In such event the bank would simply have held an overdraft, but as a matter of fact it did hold the Moss note, and there was nothing to suggest that it was not ample security for such loans as were made. It was the church and not the bank which had unlimited confidence in Fuller, made manifest by his unlimited authority to draw upon this account at pleasure.

It follows that the judgment must be set aside. It also follows that judgment should be for the Trust Company in the amount claimed by them in their setoff—that is to say, they should be allowed credit for each of their notes in controversy discounted by Fuller. *C. G. Blake Co.* v. *W. R. Smith & Son*, 147 Va. 960, 133 S. E. 685.

The judgment appealed from must be reversed and final judgment entered for the defendant. It is so ordered.

*Reversed.*