# Richmond.

## E. R. MASSIE v. H. FIRMSTONE.

### November 16, 1922.

1. BROKERS—*Real Estate Brokers—Action for Commissions—When Broker Entitled to Commissions—Suit for Securing Purchaser—Case at Bar.*— In the instant case the plaintiff, a real estate broker, was suing defendant, a landowner, for commissions for securing a purchaser. The plaintiff's own testimony showed that he was not requested, but asked permission, to furnish a purchaser; that his compensation depended upon a consummated sale to such purchaser; that the landowner was careful to reserve the right to sell the property to others if he chose; and that no sale was in fact made to the proposed purchaser whom plaintiff introduced.

   *Held:* That even plaintiff's own testimony had not made out the case set up by him, or any other case upon which he was entitled to recover.

2. BROKERS—*Real Estate Brokers—When Broker Entitled to Commissions—Completed Sale.*—Where the authority given to a real estate broker by the owner of the real estate does not require a contract in writing with the purchaser, the broker is entitled to his commissions when he has produced a purchaser able, ready and willing to buy, although no written contract for the sale is entered into between the owner and the purchaser.

3. BROKERS—*Real Estate Brokers—When Broker Entitled to Commissions—Completed Sale.*—But where a broker is not merely authorized to find a purchaser, but in order to comply with his undertaking the property must be actually sold, the broker does not become entitled to his commission by merely producing the customer who is ready, willing and able to purchase, unless a sale or contract to sell is actually entered into by the owner of the land.

4. BROKERS—*Real Estate Brokers—When Broker Entitled to Commissions—Completed Sale—Reservation of Right to Sell to Others.*—A real estate owner has a right to stipulate that he will pay no commission until a sale is made, and in the meantime to reserve to himself complete control and power of alienation over the property.

5. BROKERS—*Real Estate Brokers—When Broker Entitled to Commissions—Completed Sale—Case at Bar.*—In the instant case an action by a real estate broker against a landowner for commissions the broker's

right to commissions was dependent upon the completion of the sale with the proposed purchaser. Upon the trial, the broker did undertake to testify that there was a perfected verbal sale of the proposed property. But his own testimony, taken with his correspondence, estopped him from any such contention. This testimony and correspondence showed that he knew that there had been no contract in writing; that the landowner refused to give the proposed purchaser an option on the property, but would only deliver a deed when the money was paid; that the landowner, referring to the possibility of other purchasers, said that he "did not think there would be any interference of any kind in the matter;" and that the proposed purchaser had asked the privilege of sending timber experts on the property, a wholly unnecessary request if the property had already been purchased by him.

6. Witnesses—*Conflict of Testimony—Right of Party to Ask Jury to Accept as True Statements Most Favorable to Him—Where Party is a Witness.*— As a general rule when two or more witnesses introduced by a party litigant vary in their statements of fact, such party has the right to ask the court or jury to accept as true the statements most favorable to him. In such a situation he would be entitled to have the jury instructed upon his contention, or if there were a demurrer to the evidence, the facts would have to be regarded as established in accordance with the testimony most favorable to him. This is not true, however, as to the testimony which he gives himself.

7. Witnesses—*Conflict of Testimony—Right of Party to Ask Jury to Accept as True Statements Most Favorable to Him—Where Party is a Witness.*— No litigant can successfully ask a court or jury to believe that he has not told the truth. His statements of fact and the necessary inferences therefrom are binding upon him. He cannot be heard to ask that his case be made stronger than he makes it, where it depends upon facts within his own knowledge and as to which he has testified.

8. Brokers—*Real Estate Brokers—Right to Commissions—Purchaser Ready, Able and Willing to Take the Property.*—Where it appears that a proposed purchaser, furnished by a real estate broker, was unable to buy the property himself, that he could only have done so by using the property as a basis for a loan, or by getting help from others whose names were not disclosed and from whom it was not shown that he had any authority to make the purchase, such proposed purchaser is not a purchaser ready, able and willing to take the property so as to entitle the broker to commissions even though the broker's contract with the landowner did not require an actual sale to entitle him to commissions.

Error to a judgment of the Circuit Court of Alleghany

county, in a proceeding by motion for a judgment for money.   Judgment for defendant.   Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Geo. A. Revercomb* and *W. Chapman Revercomb*, for the plaintiff in error.

*J. M. Perry*, for the defendant in error.

KELLY, P., delivered the opinion of the court.

This is a proceeding by notice of motion for judgment instituted by E. R. Massie against H. Firmstone, to recover compensation alleged to be due to Massie for procuring a purchaser for certain real estate owned by Firmstone.   There was a verdict and judgment below in favor of the defendant, and the plaintiff assigns error.

There is some apparent conflict in the oral testimony, but upon a careful analysis, and in view of the correspondence between the parties, the facts material to the merits of the case are not open to serious controversy. The judgment for the defendant would have been right if it had been rendered upon a demurrer to the evidence.

Massie was a real estate agent at Clifton Forge.  Firmstone owned a tract of land nearby containing about 20,000 acres, upon which he resided and kept his office. This land was for sale, but was not listed with Massie or any other agent.   He permitted Massie to bring prospective purchasers to see the property, but was careful always to retain the privilege of selling it himself.

On October 30, 1919, Massie took Milton Dashiell, a Baltimore lawyer and real estate speculator, with whom he had a very limited acquaintance, to see the property.

They made the trip by automobile, and upon arriving at the Firmstone home Massie left Dashiell in the machine while he went in and had a private interview with Firmstone, telling him that Dashiell was outside, was a prospective purchaser, and asking if he might introduce him. Receiving an affirmative answer, he then introduced Dashiell to Firmstone, and this was followed by a long interview between Dashiell and Firmstone, as a result of which they reached a verbal agreement as to the price and terms of sale. Whether this verbal agreement went far enough to constitute both an offer and an acceptance is a matter as to which there is a conflict of testimony between Firmstone and Dashiell. Dashiell says he considered the property sold to him; that he definitely agreed to take and pay for it, and that he was to have a reasonable time, anywhere from two weeks to two months according to his convenience, within which to examine the title and make payment. Massie's oral testimony corroborates Dashiell in this respect. Firmstone testified in substance that he did not so understand the agreement, and did not consider that he had sold the property to Dashiell or that he had surrendered his right to withdraw the offer at any time before acceptance.

In about ten or twelve days after this interview, Firmstone telephoned and wrote to Massie that another purchaser had turned up, and that he would not deal further with Dashiell.

Since the trial of this case Firmstone has died. His testimony was refreshingly frank, and evinced a willingness to swear to his own hurt if that course was necessary to a full and unreserved disclosure of all the material facts within his knowledge. His version and interpretation of the understanding in so far as it conflicts with the version thereof given by Dashiell, is strongly,

if not conclusively, corroborated by certain undisputed facts and circumstances in the case. Among these may be mentioned the following: Dashiell had never heard of the property before and had made only the briefest and most superficial examination of it. He was entirely dependent for his information as to the value of the property upon information given him that day by Firmstone, whom he had never theretofore seen. He did not have money of his own with which to buy the property, and he had no authority to buy for anyone else. He was a lawyer and knew that a binding contract for the sale of real estate had to be in writing, and yet, if his testimony is true, he undertook to absolutely close that day a contract by word of mouth for $100,000.00 worth of property with an utter stranger without obtaining any written evidence of the alleged sale. He explains this by saying that he offered to pay something in cash and take a written memorandum, and that Firmstone said that course was unnecessary between such gentlemen as they were; but notwithstanding this, he thought it necessary to obtain, and did obtain, permission from Firmstone for certain timber men, by whom he said he wished to have an inspection made, to go upon the property.

But, conceding that Dashiell's testimony as a whole must be regarded as in conflict with Firmstone's, that conflict, in our view of the case, is not material to the issue here.

[1] The plaintiff is suing for compensation for securing a purchaser. His notice of motion by which this proceeding was instituted, addressed to Firmstone, says: "I * * * will * * * move said court for a judgment against you for the sum of $5,000.00, which amount you owe me as compensation for securing for you at your request a purchaser for a tract of land which you informed me you desired to sell."

The evidence does not make out the case set up by the plaintiff, or any other case upon which he is entitled to recover.   His own testimony shows that he was not requested, but asked permission, to furnish a purchaser; that his compensation depended upon a consummated sale to such purchaser; that Firmstone was careful to reserve the right to sell the property to others if he chose; and that no sale was in fact made to the proposed purchaser whom he introduced.

[2, 3] He seeks to recover upon the authority of *Low Moor Iron Co.* v. *Jackson,* 117 Va. 76, 84 S. E. 100.   But that was a case of the very common type in which the real estate broker was to be paid a commission if he furnished a purchaser before someone else did, and in which the compensation did not depend upon a completed sale. Under the facts of that case this court said: "Where, however, as in this case, the authority given to the broker by the owner of the real estate does not require a contract in writing with the purchaser, the broker is entitled to his commission when he produces a purchaser able, ready and willing to buy, although no written contract for the sale is entered into between the owner and the purchaser."

The language quoted above undoubtedly states the general rule applicable to a case of that type.   But the opinion in that case recognized the rule which in our opinion is applicable to the case at bar as follows: Where a broker is not merely authorized to find a purchaser, but in order to comply with his undertaking the property must be actually sold, "the broker does not become entitled to his commission by merely producing the customer who is ready, willing and able to purchase, unless a sale or contract to sell is actually entered into by the owner of the land;" and for this latter proposition the court cites *Caldwell* v. *Tannehill,* 117 Va. 11, 84 S. E. 6;

2 Mechem on Agency, section 2427; 2 Skyles & Clark on Agency, section 1770.

[4] The owner of real estate must take notice of the general rules of law applicable to the business of real estate brokerage, and if Firmstone had requested or authorized Massie to find a purchaser for the property at a stated price without further conditions, then, assuming that Dashiell was able, ready and willing to buy, the judgment complained of in this case would be wrong. But a real estate owner has a right to stipulate that he will pay no commission until a sale is made, and in the meantime to reserve to himself complete control and power of alienation over the property. This is just what Firmstone did. That Massie voluntarily assumed the risk of these conditions clearly appears from his own testimony. The only agreement he claimed to have was stated by him to the jury as follows: "The only thing I claim is that Mr. Firmstone told me that any time I brought a purchaser and a sale should result he would pay me a commission. I did not consider that I had the property listed in my hands."

[5] Although Massie did undertake to testify that Firmstone and Dashiell perfected a verbal sale on October 30th, his testimony as a whole, taken with his correspondence, estops him from any such contention. He knew that there had been no contract in writing; that Firmstone had said to Dashiell that he would not give an option on the property but would only deliver a deed when the money was paid; and that Firmstone had said that he "did not think there would be any interference of any kind in the matter," meaning, as Massie understood, to refer to the possibility of other purchasers coming in. He further knew that Dashiell had asked the privilege of sending timber experts on the property, a wholly unnecessary request if the property had al-

ready been purchased by Dashiell.    All these things appear in Massie's testimony; but they are even more convincingly established by his letters to Firmstone written subsequent to the interview of October 30th.    He wrote Firmstone on October 31st as follows:

"My trip to see you with Mr. Dashiell yesterday was, of course, entirely voluntary on my part.    I did not know that you would even price your place, but since you have, and he has given me every assurance that he will take the place, I wish to get my mind easy as to my end of the transaction.    I take it for granted that if sale is made, you will allow me the five per cent., the same that I was to have a few years ago.    Let me know, please, if I am correct in assuming this?"

To this letter Firmstone replied on November 3rd as follows:

"I have your letter of the 31st ultimo.    If Mr. Dashiell's visit here should result in a sale, you are, of course, entitled to a commission, the only question being how much.    If the property had been placed in your hands and you had hunted up a customer, I would have agreed to a five per cent. commission, but think it too much in the case of a simple introduction as in this case. I think we can agree on this question if a sale takes place.

"Please understand the property is not placed in your hands for sale, and I do not want you to offer it or call anybody's attention to it further than what you have done with Mr. Dashiell."

It will be observed that the former letter, Massie to Firmstone, October 31st, concludes any question as to the alleged request that Massie should furnish a purchaser; and that both letters show clearly that no sale had yet been made to Dashiell.    Massie's reply to Firmstone's letter of November 3rd undertook to argue

with Firmstone the question of the amount of compensation, but did not intimate any question as to the construction which Firmstone placed upon the interview with Dashiell.

On November 7th Massie wrote the following letter, which he was never able to satisfactorily explain in his testimony:

"I have a letter from Mr. Dashiell. stating a man would be here the first of next week, his duties are to inspect the timber, and unless you have some one to guide him, we will have to get some one.  His letter is very encouraging, and I feel sure the deal will be closed as per your talk with Mr. Dashiell.

"I will bring the man out in my car, and if we can make some arrangements as to getting him a place to stay whilst there, also a horse to ride, if necessary, it would be very well; of course he can't do this work in a day and perhaps will be there the best part of two weeks. If you know of any one who will keep him, would greatly appreciate it, also if you can suggest a good man as guide.  Expecting to see you early next week, I am."

The foregoing letter speaks for itself, and speaks conclusively.  The deal was not closed, but the prospects were encouraging.

On November 8th Firmstone replied to the letter last above quoted as follows:

"I have your letter of the 7th instant.

"I have a man here, Jack Nicely, who will go with the timber cruiser.  A place for the cruiser to stay is another matter, but I will see if anything can be done."

On November 11th Firmstone, after having first telephoned Massie to the same effect, wrote him as follows:

"Mr. Wight turned up here today with a Mr. Massie and his son from Lynchburg, who are in the timber business.   Mr. Wight explained to me that he did not care

to make an agreement as to hauling out timber over the railroad, except with parties whom he knew to be perfectly friendly to him; so he is trying to induce Mr. Massie to purchase the timber from me, and they are now out in the woods making a short examination.

"You will recollect that, when you and Mr. Dashiell were here, I explained to you that I had leased the railroad to Wight & Co. with no obligation on them to haul out any timber from the property. It is plain to me that there is no use in your going any further in the matter unless you can enter into an agreement with Wight & Co. to utilize the railroad, and this is the first thing that you should do in the matter, and it looks to me as if you might have some difficulty in accomplishing this, in view of the fact that Wight is not obliged to do anything, and, if he should elect to do anything, he would give first preference to his friends.

"I have just explained this matter to you by phone, and in reply to your question as to what I thought you ought to do in the matter, I suggested that you should write or wire Mr. Dashiell that there was no use in his going any further in the matter until he had first found out whether he could come to any arrangement with Mr. Wight."

Massie's reply to the above letter under date of November 12th was as follows:

"I am sending you a copy of the telegram.

"We will be there in a day or so, the weather is rather bad to start in, we asked you the day we saw you if you would give us the privilege of looking the timber over, and my understanding was that this was to be allowed. Dashiell told me positively that he was going to buy this tract, and so states in a letter, or practically so.

"If your estimate is conservative the deal is assured and it certainly is.

"We propose to pay spot cash and the deal will be consummated.

"I urge you to allow us to comply with the oral agreement."

The telegram referred to in the foregoing letter was one which had evidently been received by Massie from Dashiell after Dashiell had learned that another purchaser was interested in the property, and the telegram was as follows: "Baltimore, November 11, 1919.    Will keep agreement with Firmstone regardless of railroad. Sending timber expert."    It is true that there was an undated telegram introduced during the oral testimony by Massie to the following effect: "Still ready pay cash Firmstone land, arrive Friday with cash;" and there seems to be a contention in the petition upon which this writ of error was granted that this was the telegram referred to in the last mentioned letter.    It is perfectly clear, however, from Massie's own testimony that this telegram was not received by him until after he had written the letter of November 12th, and it seems highly probable that he did not receive it until after Firmstone had definitely withdrawn the offer previously made to Dashiell.

On November 13th Firmstone replied to the letter last above set out, and in that reply he said: "I do not feel that I am bound to Mr. Dashiell.    I named him a price, but declined to give him any option.    My idea was that if he sent parties to examine the property he did so at the risk of other parties coming in in the meantime.    I am not bound to anybody at this time."

On the same day it seems that Firmstone telephoned Massie and then wrote him as follows: "I write to confirm my telephone conversation with you a few minutes ago.    I then told you that I wished you to notify Mr. Dashiell that the matter of the purchase of the Longdale property was off.

"As I wrote you earlier today, I do not consider that I am bound in any way to Mr. Dashiell. I named him a price and distinctly stated that I would give him no option, but agreed that it was perfectly satisfactory to me for him to have the property cruised if he so desired. I did not agree to hold the property for him during the time he was having it cruised; that would simply have amounted to an option, and this I told him I would not give."

The remaining letter material to this controversy was written by Massie to Firmstone on November 13th, and was as follows:

"I feel that we labored under a wrong impression if your view of the matter is correct.

"We were certainly under the impression that you intended to let our party see the timber. Mr. Dashiell was sure you would do this because he said 'now I am not going to ask for an option' and 'you will agree to let me send a man here;' further, Mr. Firmstone, we had asked you to make arrangements for him and the wire from Dashiell was proof of his sincerity. I do not know how you may regard my claims, but I feel you should at least give me something, because I certainly had it sold and fate had decreed that I should lose the sale by an occurrence which was in every way unknown to me, also to you when we saw you.   *   *   *   "

[6, 7] From the testimony of the plaintiff and the correspondence as set forth, it is manifest that his commissions were dependent on an actual sale. Even if there was a verbal agreement to sell, which Firmstone denied, neither party was bound by it, but, according to the plaintiff's own testimony and admissions, there was not even a verbal sale. If Dashiell's testimony as a whole can be said to show the contrary, and if a verbal sale could be regarded as a compliance with the conditional

contract for commissions, we would have to disregard Dashiell's testimony.   As a general rule when two or more witnesses introduced by a party litigant vary in their statements of fact, such party has the right to ask the court or jury to accept as true the statements most favorable to him.   In such a situation he would be entitled to have the jury instructed upon his contention, or if there were a demurrer to the evidence, the facts would have to be regarded as established in accordance with the testimony most favorable to him.   This is not true, however, as to the testimony which he gives himself.   No litigant can successfully ask a court or jury to believe that he has not told the truth.   His statements of fact and the necessary inferences therefrom are binding upon him.   He cannot be heard to ask that his case be made stronger than he makes it, where, as here, it depends upon facts within his own knowledge and as to which he has testified.

In the instant case the plaintiff did not merely have a contract to furnish a purchaser.   His contract provided that no compensation was to be paid unless the sale was actually made to the purchaser whom he produced.   This may have been an improvident contract on his part, but he made it, and, indeed, it was the only one he could have secured from the defendant, who seems to have been very cautious in his dealings with real estate agents and speculators, and would not list the property for sale or give options upon it.   The sale was never made.   All this appears from the plaintiff's testimony and from letters which he admits having written, and it is conclusive of the controversy.   The case is controlled by the general principles upon which the decision was based in *Caldwell* v. *Tannehill*, 117 Va. 11, 84 S. E. 6, and does not fall within the general rule recognized in *Low Moor Iron Co.* v. *Jackson*, 117 Va. 76, 84 S. E. 100.

Before leaving this branch of the discussion it may be well to advert to a statement in the testimony of both Massie and Dashiell to the effect that at the interview on October 30th Firmstone referred to Massie as being both his agent and his friend, and said that Dashiell could in the future communicate with him with reference to the property. Firmstone was not asked about this statement and did not deny it in his testimony. If he had expressly admitted it, the result would not have been affected. He unhesitatingly stated that he had authorized Massie to act for him that day in the limited sense in which he created the agency, and that clearly was all he meant by any reference to Massie as his agent.

[8] If it were necessary to do so, the judgment of the lower court could be affirmed in this case upon the proposition that Dashiell was not a purchaser ready, able and willing to take the property on the day of the alleged sale or at any time before the deal was called off by Firmstone. It affirmatively appears that he was unable to buy the property himself; that he could only have done so by using the property as a basis for a loan, or by getting help from others whose names he had not disclosed and from whom he does not show that he had any authority to make the purchase.

It follows that under no view of the case can the judgment be disturbed, and it is, therefore, unnecessary to enter into any discussion of the instructions. No other verdict than that which the jury rendered could properly have been found. *Crockett* v. *Grayson*, 98 Va. 354, 358, 36 S. E. 477; *Vaughan* v. *Pleasonton*, 112 Va. 508, 513, 71 S. E. 529.

There is no error in the judgment complained of, and it is affirmed.

*Affirmed.*