# Staunton

J. W. FAGG v. JACK CARNEY, AN INFANT, WHO SUED BY, ETC.

September 22, 1932.

Present, Campbell, C. J., and Holt, Epes, Gregory and Chinn, JJ.

The opinion states the case.

*Gilmer & Wysor,* for the plaintiff in error.

*John S. Draper, Alton I. Crowell* and *John W. B. Deeds,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

Jack Carney, a boy ten years old, was on September 21, 1929, in the daytime, struck by an automobile driven by J. W. Fagg. The accident occurred on Randolph avenue, a street in the town of Pulaski. He has recovered a verdict and judgment, from which Fagg has appealed.

Randolph avenue runs north and south. Down its center is a concrete roadway, eighteen feet wide, flanked by dirt shoulders. There are no sidewalks. 10th and 11th streets cross it at right angles. The block so made is 320 feet long. On its west side there are three residences, and on the east two. Children were in the habit of playing there as children will.

Melvin Stuart, in a one-horse wagon, was driving north on his proper side of Randolph avenue. In it were four sacks of food stuff, two on the floor and two standing on end, supported by the tailboard of the wagon. When opposite, or nearly opposite, Carney's home on the northwest corner of 10th street and Randolph avenue, Carney, who was roller-skating on the concrete pavement and going south, turned in behind the wagon, caught hold of it, and, coasting,

was by it carried north for something like 150 feet, when he turned the wagon loose. At the moment of the accident he was ten or fifteen feet behind it and about 180 feet from where he first took hold. Fagg with the aid of a chance passer-by, Clarence Gusler, took him to the hospital on the southwest corner of 10th and Randolph avenue, and then promptly, as was his duty, reported this happening to the town authorities.

The motion for judgment states that Carney was then "skating with due care near the edge of the right side of the pavement of said Randolph avenue." It is further charged that the automobile was being driven "recklessly and with wanton disregard of life and limb of others * * * at an extraordinarily improper and unreasonable rate of speed."

Carney himself has testified as to this rate of speed, as has Vernon Flick. This is the statement which Mrs. Carney, his mother, said her son made to her immediately after he reached the hospital: "He (Fagg) said 'he had no business running so fast.' And he (the son) said, 'He (Fagg) said he was making fifty.' I (Mrs. Carney) said, 'He (Fagg) must have meant fifteen.' Jack said, 'No, he said fifty.'" Young Carney, when finally recalled, said that Fagg was going "50 or 60."

That Fagg should have made such a statement to the boy does not seem to be very probable. Fagg himself said that he was running at the rate of about twenty miles an hour and at the first trial, which resulted in a hung jury, he testified that his speed was around thirty miles. Young Carney was asked on direct examination, "Did you see the car before it struck you?" He answered, "No, sir, I saw it about half way around the wagon." From this it is plain that he did not see the car until about the moment of impact and so he could not possibly have had an oportunity to estimate its speed. He told Miss Osborne, a hospital nurse, that he did not know how the accident happened, and he told Miss

Baker, another nurse, that he did not see the car until it hit him.

The other witness who testified as to excessive speed is Vernon Flick. Vernon is twelve years old and has never driven a car. He had been sick and was in his home upstairs. That home is on the southwest corner of 11th street and Randolph avenue. He "guessed" that the Fagg car was going sixty miles an hour. He sat by a window facing south and said that he saw Fagg coming down Randolph street from the north before he reached 11th street. That is to say, he saw him through a window other than that by which he sat. From the point of intersection of the south line of Flick's house, extended to Randolph avenue, it is sixty feet to the point of accident. If Vernon's head was out of this south window it was possible for him to have seen this car for sixty feet, but if he was looking out of an east window at Fagg as he came from the north, he could not have seen him from his seat by the south window at all when he cleared the house, and probably could not have seen him at the time of the accident. If he actually saw him in such circumstances, his glimpse must have been too fleeting to afford any fair basis for estimating speed.

Evidence for Carney is that after the car struck him it ran on for about 180 or 200 feet and stopped in front of his house. Fagg said that he stopped within about seventy-five feet. T. P. Crockett, sheriff, says that it stopped within about twenty-three steps. That is also the statement of C. E. Bones. J. I. Carper, chief of police, went to the place of accident in response to Fagg's report and took memoranda of measurements. His evidence is that the car stopped within eighty-five feet.

We of course recognize the fact that we are dealing with a verdict and judgment, and we recognize the weight which must be given to them when there is conflict in the evidence.

Near the center of the road, or a little to the east of center, was a large blood spot, and from near that spot

Fagg's car-tracks, which were plainly visible, turned sharply to the right and ran off the concrete at a distance from the point of turning estimated to be from twenty-three to twenty-nine feet. There was no skidding. It is a matter of common knowledge that a car, traveling at the speed it is claimed this car was traveling, would have turned over or skidded in making such a turn.

Evidence was introduced to show that cars of this type can be stopped within far less distance than witnesses for the plaintiff say that this car was stopped. But here there was no occasion for an emergency stop; the accident had already happened. Nowhere is it claimed that there was any effort to stop before the collision. Fagg's evidence is that he did not see the boy until it was too late to make any such effort, and Carney's testimony, when analyzed, is to the same effect.

The evidence for Fagg is that he was not running at an excessive speed. Estimates run from twenty to thirty miles an hour; twenty-five miles is a fair average.

Carney says that he was coasting along ten or fifteen feet behind the wagon and three feet from the edge of the concrete when struck. No plaintiff has a better case than he makes out for himself when testifying. *Massie* v. *Firmstone*, 134 Va. 450, 114 S. E. 652. He could not possibly have been hit at that point for the automobile track never went anywhere near it. As a matter of fact, he was struck by the running-board of the automobile as it turned to avoid him. The point of impact on it plainly appeared. He was thrown forward and to the left, and so the first blood mark on the pavement would have been to the left and to the east of that point. Exactly what happened we shall never know, but the probabilities are that this boy on skates struck out from behind the wagon which he was following, just as the automobile had about reached its rear, and was struck as the car whirled to its right, and that neither was cognizant of danger until it was too late.

That Fagg did not see Carney is not enough. If in the exercise of reasonable care he should have seen him, or should have known that he was behind the wagon, then the jury, under *Price* v. *Burton,* 155 Va. 229, 154 S. E. 499, might have found for the plaintiff, because a child on skates following a wagon may dart out at any moment. With such knowledge, Fagg should have driven with extra caution.

He did not see him. Should he have seen him? Melvin Stuart, the driver of the wagon is the only witness who has answered. He first saw Fagg approaching as Fagg "come over the little rise above 11th street." In other words, this witness saw Fagg as soon as Fagg was visible. This statement concludes his examination:

"Q. You don't mean to tell the jury you saw Mr. Fagg coming from toward Needmore before this Carney boy caught behind the wagon?

"A. No, I did not mean that—before he caught the wagon I seen him—I seen him after he caught behind the wagon."

Stuart saw Fagg as soon as by any possibility Fagg could have seen Stuart. At that time Carney was out of sight behind Stuart's wagon.

Of course, the boy is guilty of contributory negligence if such a defense can be relied upon, but he was only ten years old and the presumption is that he was incapable of exercising proper care and prudence—a presumption rebuttable, it is true. *Morris* v. *Peyton,* 148 Va. 812, 139 S. E. 500; *Filer* v. *McNair,* 158 Va. 88, 163 S. E. 335. With contributory negligence out of the way this case still falls because there is no evidence of primary negligence on behalf of Fagg.

Plaintiff has moved to dismiss the appeal for the following reasons:

"Assignments of error No. 1 and No. 2, set out on page two of the petition, allege error in the giving of instructions No. 1 and No. 2, respectively, on behalf of the

plaintiff, and on page five of the petition, in discussing the alleged error in these two instructions it is said:

" 'Instructions numbered 1 and 2 (Petition, page 117), given at the request of the plaintiff, both involve the question of contributory negligence on the part of the Carney boy, an issue which was not involved in the case at all, and a defense which was not pleaded.'

"Contributory negligence on the part of the plaintiff was the principal issue involved in the trial of this cause in the lower court, and was specifically pleaded as shown by the following stipulation of counsel which has been duly filed with the clerk of the Supreme Court of Appeals as a part of the record in this cause:

\*　\*　\*　\*　\*　\*　\*　\*　\*

"For the reasons set out above, we respectfully submit that the Honorable Justices of the Supreme Court of Appeals did not have a complete record in the cause at the time of the granting of the writ of error, and that the omitted portion of the record completely nullifies Assignment of Error No. 1, and further nullifies the principal error alleged in Assignment of Error No. 2, and that had the complete record in the cause been before the Court of Appeals at the time of the petition for a writ of error the same would have been refused."

A plea of contributory negligence was filed and inadvertently omitted from this record. The court, therefore, very properly undertook to instruct the jury on that subject. But this case, as we have seen, does not turn upon any such question. The defendant in error must fail because primary negligence has not been shown, and on that the omission of the plea from the record can have no possible bearing.

For reasons stated, the judgment of the court below must be reversed and the case dismissed. It is so ordered.

*Reversed.*