# Richmond

### GILBERT B. GLASCOCK v. FLEET H. JAMES.

January 15, 1945.

Record No. 2859.

Present, All the Justices.

The opinion states the case.

*Edwin E. Garrett* and *Frank L. Ball*, for the plaintiff in error.

*Wilbur C. Hall* and *Charles Pickett*, for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This action was instituted by Fleet H. James by notice of motion for judgment against Gilbert B. Glascock, defendant, for the recovery of commissions due James for finding a purchaser of real estate owned by Glascock. The defendant filed a plea of the general issue and, at the request of the plaintiff, grounds of defense. The grounds of defense denied generally all of the allegations in plaintiff's notice of motion, and specifically set out that Glascock and the proposed purchaser had never agreed upon any terms of sale.

The evidence was heard by a jury. At the conclusion of the plaintiff's evidence, the court overruled a motion to strike it. The taking of all the evidence was thereafter concluded. Upon a consideration of all the evidence and the instructions of the court, the jury returned a verdict in the following words:

"We, the jury, believe from the evidence that Piggott and Glascock reached a complete agreement respecting the sale of the farm and the personal property on Monday after-

noon, and recommend that the plaintiff be paid a commission of $500."

This verdict was amended at the bar of the court to read as follows:

"We, the jury, on the issues joined, find for the plaintiff in the sum of Five Hundred Dollars."

Thereupon, the defendant moved to set aside the verdict as being contrary to the law and the evidence, and without evidence to support it, and for errors of the court in granting and refusing certain instructions. The plaintiff moved the court to set aside the verdict of $500, and enter a judgment in his favor for $1,300, in accordance with the instructions given in the case. The court overruled both motions and entered judgment for the plaintiff for $500. The defendant applied for and obtained this writ of error, and the plaintiff assigns cross-error to the refusal of the court to set aside the verdict of the jury and enter a judgment for $1,300 in his favor.

The first question is the sufficiency of the evidence to support a verdict for the plaintiff. The facts will be briefly stated, in the light most favorable to the plaintiff, in view of the jury's verdict.

James is, and has been, a duly licensed real estate agent in Purcellville, Loudoun county, Virginia, for ten years, where he maintains an office for the conduct of his business. The defendant is the owner of a dairy farm near-by, stocked and equipped, which he operates and on which he dwells.

According to James the history and facts of the case are as follows:

In 1941, the defendant listed his dairy farm with James for sale at $17,000. James, in undertaking to find a purchaser, on May 2, 1942, learned that Currell Piggott, who lived in the same community, desired to purchase a dairy farm fully stocked. On that day he, James, conferred with Glascock in his office, at Purcellville, with reference to getting a price on the farm, its dairy equipment and machinery. Glascock gave him a price of $20,000 upon the farm itself, at that time explaining the increase of $3,000 by saying that

the value of the land had gone up. He first gave him a price of $25,000 for the farm, certain equipment and livestock. A few minutes later he raised the price to $26,000, saying that the additional $1,000 gave him something to trade on. The commission on the sale was discussed, and it was agreed that it was to be 5% on $26,000. The amount of the commission was "figured out" on the reverse side of a tablet and a copy was given to Glascock, which showed that in the event of a sale for $26,000, he was to receive $24,700 net. A list of the personal property to be included in the sale was made up and signed by Glascock and given to James.

On the same day James took Piggott to the farm, and when they got there and looked over the farm and the personal property, Piggott saw some unlisted machinery, hay, and other property which he wanted. Glascock told Piggott if he wanted everything, he would have to pay more money, and Piggott replied that he wouldn't pay any more. Later that day Piggott brought his wife to the farm, and after some negotiations offered Glascock $26,500 for the farm and everything connected therewith, except the beef cattle and certain household belongings; but Glascock told him he wanted $27,000.

On that afternoon, when James and Piggott arrived at the farm, Glascock called James aside and told him that he didn't think he should be charged a commission on the personal property, and that the commission should apply only on the value of the farm. James replied, "Mr. Glascock, that was not our agreement. We agreed on 5%; you knew you were paying 5% and you made a note of it and put that note in your pocket. There has been no misunderstanding about that whatsoever."

On the next day, Sunday, Glascock went to the home of James, and stated that Piggott had been to his farm that morning, and wanted to buy it with some additional property not on the original list; but that unless James would forego his commission on the personal property, he wouldn't make a sale. He said he had told Piggott he would take a note for the difference between $26,000 and the $27,000

he was asking for the farm on account of the additional personal property. James again reminded Glascock that he agreed to pay a commission on the farm and the personal property, and that he, Glascock, had been given a copy of the agreement, and had put it in his pocket. James told him that the commission was $1,300 on a price of $26,000, and he would not expect any commission on any additional property sold. Glascock's answer was "You are going to lose the sale of the farm because of the personal property," and left the home of James.

Finally, about six p. m. on the next day, Glascock and James reached an agreement of sale, whereby Piggott was to purchase the farm and all of the personal property thereon, except the beef cattle and certain specified household goods which Mrs. Glascock desired to retain. The agreement was that Piggott was to pay $27,000 for the farm and personal property, $26,000 of which was to be in cash and $1,000, evidenced by a note, payable in two years at 3% interest. Possession was to be given Piggott on May 15, 1942, and taxes and insurance were to be prorated and adjusted as of the date of the deed. The May milk check was to be divided, so that Glascock and Piggott would get the respective amounts for milk sold by them during that month.

At the conclusion of the agreement, James started to his automobile to get a contract form. Some question arose as to whether Glascock would be able to get a Federal Land Bank loan paid off in time to give Piggott a deed by the 15th of May. However, it was agreed that possession should be given on that day. Glascock said it was late in the evening; that it was not necessary for Piggott to make a deposit, or prepare the contract then, because he was "good for his bond;" and that he would like to get some one to represent him when the terms of the contract were reduced to writing. He added that he would stand by his contract and would not back out. The three persons then parted, to meet at ten o'clock the next morning, May 5th, at the office of James in Purcellville.

The next morning Glascock appeared at the office of

James more than an hour later than the time agreed on. Piggott was present, and James had prepared a rough draft of the agreement and its terms. Glascock came in and, after seating himself, said, "I guess I've backed out." He was told it was too late to talk about backing out. He replied, "The women folk at home don't want me to sell the· farm." Then James said, "Mr. Glascock, that may be true, but you sold Mr. Piggott your farm yesterday evening and Mr. Piggott bought that farm and as far as I am concerned, it was sold and he bought it, and you can refuse to give Mr. Piggott possession of this farm but you owe the commission, because I brought Mr. Piggott to the farm, who was ready and willing to pay the price." Glascock said that there were some things which belonged to his wife that he did not intend to go with the sale, and there was other personal property he did not realize was included in it. He went over the list and put a value on each item, saying that he was not willing that the amount of the items be deducted from the sale price; but wanted Piggott to take the property and add the amount to that price. The amount was less than $300. Piggott was unwilling to pay the additional amount, but was willing to exclude the property mentioned, provided its stated value was deducted from the sale price. Piggott then said that he was willing and prepared to close the contract, which was agreed upon on the day before. After some further conversation between the parties, Glascock finally said he would not close the deal and got up and walked out of the office.

On May 7th, James went to Glascock's farm and undertook, without avail, to get the latter to pay the commission of $1,300, or to submit the claim therefor to arbitration. Glascock told him if he sold the farm later on, he would pay him a commission. On May 11th, Glascock again refused to pay the commission.

Currell Piggott's evidence corroborated that of James in every material detail as to terms of sale, the final agreement of sale, and the commission to be paid by Glascock for brokerage. He testified that on Monday, May 4th, during

the prolonged negotiations, Glascock asked James if he still held out for a commission on the personal property. James replied that he did, but that he would accept $1,000 if he sold the farm and personal property for $26,500; but if he sold at $27,000, he was to be paid $1,300. He further said that a complete agreement was reached as to the personal property to be included in the sale, excluding therefrom only the beef cattle and certain household belongings, such as a grandfather's clock, a cabinet radio, a phonograph, a rocking chair, linen, china, and personal clothing, a list of which was to be made up and furnished by Mrs. Glascock, when the contract of sale was reduced to writing on May 5th, and that all questions had been settled with reference to the farm, machinery, and vehicles. He also stated that Glascock repeatedly said on the evening of May 4th, that he would stand by his contract, and that, after the final agreement, evidencing its completion, further said that he "would call the dog and walk out."

Piggott testified that he was ready, willing, and able to complete the sale upon the terms agreed on. He had a little over $12,000 on deposit in a bank, and had arranged with his banker on Monday, May 4th, prior to the final agreement, to borrow $14,000 on the property, to complete the cash payment of $26,000, and was always ready and willing to sign the $1,000 note.

H. W. Cooley, cashier of the Round Hill National Bank, in Loudoun county, testified that on May 4, 1942, Piggott had on deposit to his credit in the bank $12,125.25, and that he had made a satisfactory agreement with the bank for a loan of $14,000, to be secured by the purchased farm.

After the refusal of Glascock to carry out his contract, in an effort to salvage the wrecked sale, a further attempt was made to get him to sell the property for $26,000, on the terms first given to James. He, however, still refused to sell on those terms or on the terms of May 4, 1942. Piggott thereafter purchased a farm from another person.

The testimony of the defendant is, in some respects, irreconcilable with the foregoing evidence, and in other

respects unconvincing. He denied, in a confused manner, that there was a completed agreement of sale. He was such a reluctant, evasive and arbitrary witness that it was necessary for the court to admonish him as to his answers during his cross-examination. He showed an ignorance about material matters and a hesitancy in being frank. He admitted that he gave James' authority to sell the farm and certain specified property for $26,000. He said he didn't agree on any rate of commission to be paid, but had "an idea it was 5%," and expected to pay a commission if the sale was completed. He stated that he never agreed to pay any commission on the sale of the personal property, but didn't explain why he later asked to be relieved of it. He did not remember whether he told his wife about making the sale, nor when the several lists of property to be reserved were made up or who made them. He insisted that the difficulty in coming to an agreement related to the effort of Piggott to include a pick-up truck in the personal property sold. He raised no question of the financial ability of Piggott to purchase the farm, neither prior to his refusal to complete the sale, nor prior to the bringing of this action, nor in his testimony upon the trial thereof. At no time did he base his refusal to enter into or complete his contract of sale on the ground that Piggott did not possess the financial ability to meet its terms and conditions.

Mrs. Glascock undertook to explain the testimony of her husband, his attitude and demeanor on the witness stand, as being due to an overdose of medicine which he had taken the night before. She knew nothing about the contract of sale.

On questions of fact, the language of the original verdict showed that the jurors fully comprehended the issues relating to the completion of the contract of sale, and the production of a purchaser, ready, willing and able to buy. They believed, as they had the right to do, the evidence of James and Piggott in preference to that of Glascock. Their verdict is abundantly supported by the evidence, and we are bound by it on those issues.

The facts supporting the verdict of the jury, that a com-

plete agreement had been reached between the parties, are so strong and positive that ordinarily only a brief consideration would be given to the contention of the defendant that Piggott was not financially able to buy the property, because he did not have in his hands or in his immediate possession $26,000 in cash.

The trial of the case revolved almost entirely around the question whether an agreement between the parties had been completed. The ground of financial inability is not specifically mentioned in the grounds of defense. At no time prior to the completion of the contract of sale, or before this litigation, did Glascock contend that the contract was not consummated because of the financial inability of Piggott to comply with the terms. This subject was nowhere specifically pursued until after the jury had rendered its verdict.

Reliance for support of the above contention is placed upon decisions from other States, and upon the following statement in *Massie* v. *Firmstone*, 134 Va. 450, 463, 114 S. E. 652, 656:

"If it were necessary to do so, the judgment of the lower court could be affirmed in this case upon the proposition that Dashiell was not a purchaser ready, able and willing to take the property on the day of the alleged sale or at any time before the deal was called off by Firmstone. It affirmatively appears that he was unable to buy the property himself; that he could only have done so by using the property as a basis for a loan, or by getting help from others whose names he had not disclosed and from whom he does not show that he had any authority to make the purchase."

The record in *Massie* v. *Firmstone, supra*, discloses that the evidence was wholly dissimilar to the facts here. The statement itself was entirely unnecessary to the decision reached. However, based on the facts, the holding, that the purchaser therein never was "ready and able" to carry out his proposed contract, was fully justified. Massie was an agent with limited authority. He was not to receive a commission unless a sale resulted to a certain person. No such sale resulted.

He testified that he was worth $40,000, of which only $2,000 was in cash, and that, while he thought he could borrow the necessary money, he had made no arrangements to do so nor had he been promised the loan. There was no evidence in support of his ability to borrow the amount required on the property to be purchased or otherwise.

In the present case the evidence shows that Piggott had contracted with an established bank, a respectable lender, to have the money available at the time needed. The cashier of the bank testified that the money was available to him for the specific purpose at the proper time. Piggott had made preparations and arrangements which were in accordance with safe and conservative dealings. He pursued the customary and accepted business practice employed by a purchaser buying property requiring a larger cash payment than that in his immediate possession. Before entering into the contract, he put himself in a position to command the money. The statement in *Massie* v. *Firmstone, supra,* and the decisions from other States must be read in the light of the facts of each case.

What constitutes financial ability depends upon such a variety of circumstances as to make it difficult to state a general rule. "Able" is a word which must be given a reasonable construction. Ability to perform is sufficiently possessed if one is equipped or supplied with what is needed or can be commanded for the purpose required.

"What constitutes financial readiness or ability in these cases cannot be determined by any hard and fast rule. It is, obviously a very different question from that of solvency. Much must depend upon the terms prescribed in each case, and a man must be deemed pecuniarily able and ready when he has made the preparations and arrangements which are in accordance with safe and conservative dealing. The purchaser, for example, is not financially ready and able if he has to procure the deed of the lands in question in order that he may then go out and raise the purchase price; but he would doubtless be deemed to be if, where cash is to be paid, he is ready to turn over part himself and produces a responsible

lender who is ready to loan and pay over the residue upon receiving a mortgage contemporaneously with the delivery of the deed." 2 Mechem on Agency (2nd Ed.) section 2441.

In *McCabe* v. *Jones*, 141 Wis. 540, 124 N. W. 486, it is aptly said:

"It is a matter of common knowledge that very many, if not a majority of, contracts for the purchase and sale of real estate, are expected to be carried out by obtaining a part of the purchase money on a mortgage of the property itself, to be executed contemporaneously with the execution of the deed. If the purchaser has his arrangement made so that the money will be forthcoming at the moment the deed is passed to him, no reason is perceived why he may not truly be said to be ready, able, and willing to complete the deal, although a part of the money comes from one who at the same moment receives a mortgage of the newly purchased premises.

"Where a real estate broker sues for his commissions on a sale which his principal refuses to carry out, he cannot, of course, prove his case by showing that he produced a straw bidder, but on the other hand he is not required to show that he brought a man with the cash all in hand in legal tender. He is simply required to show that he procured a purchaser who was ready, willing, and pecuniarily able within the time fixed to take and pay for the property."

It is clear from the record and especially from Glascock's testimony that, prior to the bringing of this action, he elected to base his defense on the ground that no contract was made, and having made that election he has subsequently undertaken to repudiate the contract the jury says he entered into by raising a new defense, that the purchaser was unable to comply with the contract. The object of the grounds of defense was to require a definite presentation of the issues. His present and subsequent positions are inconsistent with the grounds then stated. See *White* v. *Bott*, 158 Va. 442, 459, 158 S. E. 880, 163 S. E. 397.

The jury were given six instructions, three at the re-

quest of the plaintiff and three at the request of the defendant. The instructions, as a whole, presented the law fairly and correctly, and in a manner not likely to mislead the jury. The defendant objected to the first instruction given for the plaintiff on the grounds that it was not justified by the evidence, and did not leave to the jury the question of whether or not Piggott was "able" to carry out his contract. This was a long instruction. In its fore part it twice directly recited the requirement that the purchaser produced must be ready, willing, and able to buy. Its concluding paragraph was as follows:

"If the agent does produce a purchaser who is ready, willing and able to purchase for the price and on the terms fixed by the owner, the owner cannot defeat the agent's right to a commission by changing his mind and failing to sign a contract with the purchaser. Nor is it necessary that the purchaser who has agreed to buy upon the owner's terms should make a deposit until such time as the owner demands the same and sign a contract to sell. Therefore, if the jury believe from the evidence that the defendant, Glascock, allowed the plaintiff James, a duly licensed real estate agent, to show or offer for sale his property to Piggott; that Piggott offered to buy said property for the price and on the terms fixed by Glascock and his offer was accepted by Glascock; that Glascock agreed to pay James $1,300.00, then the jury should find a verdict in favor of the plaintiff in the sum of $1,300.00, with interest from May 4, 1942, in their discretion, notwithstanding that no deposit was made and no contract was signed, and this is so because in such a case the plaintiff has done all he was employed to do and the fault is upon the defendant, Glascock."

In addition, instruction number 4, given at the request of the defendant, specifically covered the point in question, as well as the full grounds of defense. It read as follows:

"The Court instructs the jury that the burden is on the plaintiff to establish every essential element of his case by a preponderance of the evidence. By a preponderance of the evidence is meant, that evidence which is most satisfactory

and convincing to the jury. In order to recover in this case, he must show that he, acting as the agent and in behalf of the defendant, produced Piggott as a prospective purchaser of defendant's farm; that the said Piggott was ready, able and willing to purchase the said farm and personal property at the price and upon the terms authorized and approved by the defendant; and thereupon, the said Piggott and the defendant entered into an agreement for the sale of the farm and personal property to the said Piggott, definite and certain in its identification of the property to pass, the price to be paid; the manner and time of payment and for the consummation of the sale by the execution of the written contract or other title papers and the time and manner of delivering possession. Upon all of these essentials the plaintiff must prove that Piggott and the defendant were fully agreed. And the burden is on the plaintiff to further show that after being fully agreed on the said sale and intending that the same should be binding on the defendant, without a proper legal reason, refused to consummate the same and that failure of the said sale was entirely the fault of the said defendant.

"If the plaintiff has failed in his proof as to any one of the foregoing essentials, you will find for the defendant."

Instruction number 7, offered by the defendant, was properly refused because it took from the jury the question of whether or not Piggott was an "able" purchaser, in that it specifically told the jury that if Piggott had to make a loan on the property to pay its purchase price, he was not a purchaser "ready, able, and willing" to purchase. Instructions numbers 1 and 4 fairly and definitely submitted to the jury, in language they could not have misunderstood, the question whether James produced a purchaser ready, able, and willing to purchase. They made it perfectly clear that unless Piggott was such a purchaser, James was not entitled to any commission. *Blake Co.* v. *Smith & Son*, 147 Va. 960, 133 S. E. 685.

Instructions numbers 8 and 9, offered by the defendant, were properly refused because they were based upon a par-

tial view of the evidence, and were contrary to the instructions granted.

There is no evidence to support a finding of only $500. The vital, primary questions in the case having been determined, the question as to the amount which the jury should have found by its verdict is not difficult.

The verdict first rendered, in the language of the jury, shows that the jurors found and believed that a complete agreement had been reached between Piggott and Glascock involving the sale of the farm and the personal property. It is not questioned that James produced Piggott as the purchaser.

There was no real denial of the fact that the agency contract between Glascock and James authorized James to find a purchaser for the farm and certain personal property at $26,000, and provided for a commission of 5% on the total price quoted. Glascock admitted that he expected to pay a commission of 5% on $20,000, the value of the farm alone, a commission amounting to $1,000. On the day of listing the farm and personal property with James for sale, he made no exception of commission on the personal property, the value of which was included in the price asked. His subsequent requests for a waiver of commission on the personal property, made after the production of the purchaser, disclose his thought that the sale of the property as an entirety was covered in his contract for brokerage.

At the time of such requests no sale had been made, because Piggott was unwilling to accept the terms of the original offer. Glascock did not then take the position that Piggott was not a purchaser according to the authorized terms of sale and, therefore, he owed no commissions on a sale, nor did he break off negotiations on the ground that he would not pay a brokerage on the sale price of the personal property. Regardless of the refusal of James to accede to his request, he continued his negotiations with Piggott until he reached a final agreement. His admissions and his actions reinforce the evidence of James and Piggott that James was to receive a commission of $1,300, covering both the real and

personal property. No claim was made by James on the $1,000 included in the sale for $27,000, because of his subsequent statement to Glascock that he would only charge $1,300, if Glascock would come to terms with Piggott at a price of $27,000 for the property desired by the latter. Under the contract of agency, James was entitled to a commission on $26,000 or to none. That he refused to waive his full commission on $26,000 if sale was made at $27,000 was not denied by any one, notwithstanding the threat of Glascock to break off all negotiations for a sale at any price or upon any terms. The jury, therefore, in fixing the amount of the commissions at $500 evidently misconstrued the instructions of the court with respect to the amount of the compensation or arbitrarily sought to lighten the burden on the defendant. See Vol. 2, Digest of Virginia and West Virginia Reports (Michie), Brokers, section 27, and cases cited, or West's Virginia and West Virginia Digest, Brokers, section 39 et seq.

The facts before us being such as to enable us to attain the ends of justice, it is our duty under Virginia Code, 1942 (Michie), section 6365, to set aside the verdict of the jury, and the judgment thereon, as to the amount awarded the plaintiff, and enter final judgment for James, the defendant in error here, for the full commission claimed. *Wilson* v. *Brown*, 136 Va. 634, 118 S. E. 88; *Apperson-Lee Motor Co.* v. *Ring*, 150 Va. 283, 143 S. E. 694; *Rawle* v. *McIlhenny*, 163 Va. 735, 177 S. E. 214, 98 A. L. R. 930; Words and Phrases, Permanent Edition, Vol. 1, page 84.

For the reasons stated, the judgment of the trial court is reversed, and a final judgment entered here for Fleet H. James, the defendant in error, in the sum of $1,300 with interest from January 5, 1943, the date of the original judgment, until paid, and his costs.

*Reversed and final judgment for defendant in error.*